STATE OF CONNECTICUT *v.* ROBERT WATSON
(AC 16892)

Schaller, Spear and Kulawiz, Js.

Argued June 8—officially released September 29, 1998

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Herbert E. Carlson, Jr.*, supervisory senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Robert Watson, appeals from the judgment of conviction, rendered after

a jury trial, of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-8,[1] assault of a victim sixty or older in the second degree in violation of General Statutes §§ 53a-60b (a)[2] and 53a-8, robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (3) and 53a-8, conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-136 and 53a-48 (a), burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (2) and 53a-8, and conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-103 and 53a-48 (a). On appeal, the defendant claims that the trial court improperly denied his motions (1) to suppress photographs and eyewitness testimony identifying the defendant's automobile, (2) to suppress eyewitness identification of the defendant and (3) for judgment of acquittal based on his claim that the evidence was insufficient to support the jury's verdict of guilty as an accessory on the two counts of assault.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-60b (a) provides: "A person is guilty of assault of a victim sixty or older in the second degree when he commits assault in the second degree under section 53a-60 or larceny in the second degree under section 53a-123 (a) (3) and the victim of such assault or larceny has attained at least sixty years of age or is blind or physically disabled, as defined in section 1-1f."

General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person; or (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

The jury reasonably could have found the following facts. On October 18, 1994, Hoyt Pease, eighty-five years old, drove from his home in Southington to the Fleet Bank branch office in Berlin. He withdrew $100 from the automatic teller machine (teller machine). He was then approached by the defendant, who claimed to be lost and in need of directions to Waterbury. The defendant also claimed to be having car problems. Pease gave the defendant directions to Interstate 84, but the defendant stated that they were too confusing. Pease offered to show the defendant the way to the highway and added that it would take them past his home.

Pease drove away, followed by the defendant. The defendant was driving a red Yugo with distinctive wheel covers and a broad white stripe underlined in black. Several minutes later, the defendant honked his horn and pulled off to the side of the road. Pease stopped his car and the defendant told him that his car was overheating. Pease offered to take the defendant to his home to get water to fill the radiator. The defendant then followed Pease to his home.

The defendant followed Pease up a long inclined driveway to the two-car garage next to Pease's house. Pease filled the defendant's radiator and noted that although the water was low and the engine was hot, radiator fluid was not boiling over. Patricia Pease, his seventy-six year old wife, came outside and joined the two men. She greeted the defendant and observed that although the defendant was polite, he looked "awful," appeared "visibly very, very nervous," was "shaking" and his eyes "didn't look right."

After filling the defendant's radiator, Pease then led the defendant to a road that led to Interstate 84. The defendant told Pease that his car needed gasoline. When Pease observed that the gasoline gauge indicated that the defendant's tank was not low, the defendant claimed

that the gauge was broken. Pease then led the defendant to a nearby gas station, Patriot Petroleum.

John Aliberti, the gas station's owner, was repairing a car approximately twenty-five feet from the gasoline pumps and noticed the Yugo's distinctive wheel covers, one of which was damaged or broken. He also noticed that the defendant had parked too far from the pumps. Randy Spaulding, an attendant, walked over to the defendant to assist him, but the defendant searched his pockets and instructed Spaulding not to pump any gasoline because he did not have any money. Spaulding noticed a large number of cassette tapes on the dashboard of the defendant's car.

Pease waved goodbye to the defendant and drove away. The defendant told Spaulding, "To hell with the gas," and drove away in the same direction as Pease. Pease followed the same route home and parked his car in the garage. Approximately ten minutes later, Patricia Pease returned home and parked her car in the garage, but did not close the garage door. During this time, Patricia Verderame, the Peases' neighbor, and Paul Stocking, Verderame's business partner, were in Verderame's front yard loading firewood into Stocking's truck. They both observed the Peases arrive home.

Shortly after Patricia Pease arrived home, Verderame and Stocking observed two cars drive up the Peases' driveway at excessive speeds. The first car was a small red import with white stripes along the sides. The driver was a young, dark-skinned male approximately twenty-five to thirty years old. The second car was an older, tan-colored compact driven by a dark-skinned male neatly dressed in tan or khaki colored clothing.

Verderame and Stocking considered the arrival of the two men to be odd, but surmised that they were hired to do yard work and returned to loading firewood into

Stocking's truck. Several minutes later, at approxi-
mately 4:30 p.m., Verderame and Stocking left.

At approximately the same time, Patricia Pease heard
someone in the garage. She called to her husband, and
the two went to the garage. As Hoyt Pease entered the
garage, he was struck by a man standing to his right
near a pile of firewood logs. Patricia Pease turned and
charged his attacker, but was struck by a second blow
and knocked to the floor. She turned toward her hus-
band and saw him being struck with a log of firewood
by a neatly dressed, dark-skinned male in brown cloth-
ing. She charged her husband's attacker, but was struck
in the head with the log. The attacker then took Hoyt
Pease's wallet and fled. The couple assisted each other,
returning to the house to call 911.

Before Hoyt Pease was transported by ambulance to
a hospital, he related his interaction with the defendant
that day and described the defendant's car to Officer
Louis Palmieri. On the basis of that information, police
officers obtained the teller machine surveillance video-
tape and obtained two still photographs from the video-
tape that depicted Hoyt Pease, the defendant and the
defendant's vehicle. The following day, police officers
interviewed Spaulding, Verderame and Stocking as to
their observations the previous day. On the basis of
those interviews, the Southington police issued an alert
for a red Yugo with a white stripe on each side.

On October 20, 1994, Officer Robert Pekrul of the
Meriden police department spotted a car matching the
description issued by the Southington police depart-
ment. After running a computer check of the license
number, Pekrul learned that the car was registered to
an address at 49 Goodwill Street in Meriden and relayed
that information to the Southington police. Several
hours later, Detective Michael Shanley of the South-
ington police department and his partner arrived at 49

Goodwill Street. They observed a red Yugo with a white stripe parked at the end of the driveway. Upon further examination, Shanley noted that the car matched the descriptions given in every respect, including the large number of cassette tapes on the dashboard, as observed by Spaulding. Shanley and his partner stayed at this location and photographed the car.

Detective Craig Fournier went to Patriot Petroleum, in an effort to locate Spaulding so that he could view the car. Spaulding was not at work, but Fournier learned that Aliberti had also observed the defendant and his car. Fournier then drove Aliberti to 49 Goodwill Street.

While Shanley was taking photographs, the defendant came out of the house to speak to the detective. Two detectives from the Southington police department arrived with the teller machine surveillance photographs. Several Meriden police officers also arrived to assist in the investigation. The defendant agreed to be photographed and consented to a search of his house.

Fournier and Aliberti arrived at the house and, in part, on the basis of the broken distinctive wheel cover, Aliberti positively identified the vehicle as the car that he had seen on October 18, 1994. He further identified the defendant as the driver of the car. Shanley returned to Patriot Petroleum and showed photographs of the defendant's car to Spaulding. Spaulding identified the car as the same make, model and color as the car he had seen on October 18, 1994. Shanley also showed Spaulding an array of six photographs of possible suspects. Spaulding selected the defendant's photograph as being that of the driver of the car.

That same day, Shanley showed photographs of the car to Verderame and Stocking. Both told Shanley that the car in the photographs was very similar to the car they had seen driving up the victim's driveway.

On October 21, 1994, Fournier brought Hoyt Pease to the Southington police garage to view the defendant's Yugo. Pease told Fournier that the car looked "exactly" like the one he had filled with water prior to the attack. Pease also selected the defendant's photograph from the six photograph array. Patricia Pease, while in the hospital, was subsequently shown the array of photographs. She did not select the photograph of the defendant.

I

The defendant first claims that the trial court improperly denied his motion to suppress the eyewitnesses' identifications of his car and the photographs of his car. The defendant claims that the various identifications were unreliable and resulted from an unnecessarily suggestive identification procedure. In support of this claim, the defendant relies on *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). We reject the assertion made by the defendant that the same rule that applies to the identification of a defendant as a perpetrator applies to the admissibility of an inanimate object.

Certain additional facts are necessary to an understanding of our resolution of this issue. The defendant filed a motion to suppress the photographs of the Yugo and the identification of the Yugo by Hoyt Pease, Spaulding, Stocking and Verderame. The defendant argued that the identifications should be suppressed because they were made following an impermissibly suggestive police procedure, namely, that the witnesses were shown either the car or a photograph of the car and asked if it was the same car they had observed earlier.

The trial court held a hearing on the defendant's motion to suppress. The defendant argued that the constitutional standards governing eyewitness identification of persons should apply to eyewitness identification of inanimate objects. The trial court

agreed and applied the more stringent analysis. After concluding that the identifications were not tainted by an impermissibly suggestive identification procedure, the trial court denied the defendant's motion.

This claim is controlled by our decision in *State* v. *Taylor*, 37 Conn. App. 464, 657 A.2d 659, cert. denied, 234 Conn. 907, 660 A.2d 859 (1995). In *Taylor*, the defendant sought to exclude the victim's identification of the gun used during a kidnapping. Id., 478. The victim stated that one of the kidnappers, his brother-in-law, had shown him the gun on several occasions prior to the kidnapping. Id. The victim had handled the gun and was familiar with its size, shape, color, markings and handle. Id. The victim later spoke with an assistant state's attorney and attempted to draw a picture of the gun. Id., 479. Several days later, the assistant state's attorney showed the victim a photograph of the gun, which the victim identified as being the one owned by his brother-in-law. Id. The names of the brother-in-law and the victim were written on the photograph. Id. The defendant moved to suppress the photograph of the gun. Id.

This court held that "[t]he genesis of the rule requiring that the identification of persons accused of crime be free of the taint of a suggestive procedure comes from an acknowledgment that identification by an eyewitness of a person as the one who perpetrated the crime is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. *United States* v. *Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). It further stems from an understanding that [i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there

and then, before the trial. Id., 229. Moreover, the issue of identification of the defendant as the perpetrator of the crime is an element of all offenses and thus impacts directly on a defendant's right to due process of law since an impermissibly suggestive identification procedure may be conducive to an irreparable mistaken identification. *State* v. *Gordon*, [185 Conn. 402, 412, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982)]. We decline to elevate the identification of an inanimate object to one of constitutional magnitude because in our view, the ordinary rules governing the admissibility of objects afford the defendant adequate protection." (Internal quotation marks omitted.) *State* v. *Taylor*, supra, 37 Conn. App. 480.

Our Supreme Court "has consistently held that photographic evidence is admissible where the photograph has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 574, 710 A.2d 1348 (1998). As a general rule, a lay witness may not give opinion testimony and may testify only as to observed facts. *Acampora* v. *Asselin*, 179 Conn. 425, 427, 426 A.2d 797 (1980); *Robinson* v. *Faulkner*, 163 Conn. 365, 372, 306 A.2d 857 (1972); *Johnson* v. *Newell*, 160 Conn. 269, 277, 278 A.2d 776 (1971). Lay opinion, however, may properly be admitted regarding identity or similarity. *Johnson* v. *Newell*, supra, 276; *Harris* v. *Fitzgerald*, 75 Conn. 72, 75, 52 A. 315 (1902).

It is clear that the testimony regarding the identifications of the Yugo by Hoyt Pease, Spaulding, Stocking and Verderame was based on their own personal observations. It is equally clear that the Yugo, as the car driven by the defendant, was relevant and probative to an issue of material fact. " 'The trial court exercises a broad discretion in admitting such evidence, and its determination will not be disturbed on appeal unless a

clear abuse of that discretion is shown. *State* v. *Piskorski*, 177 Conn. 677, 700–701, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Smith*, [174 Conn. 118, 123, 384 A.2d 347 (1977)].' " *State* v. *Jones*, 39 Conn. App. 563, 573–74, 665 A.2d 910, cert. denied, 235 Conn. 931, 667 A.2d 800 (1995), quoting *State* v. *Bember*, 183 Conn. 394, 408, 439 A.2d 387 (1981).

Although the trial court improperly applied the more stringent analysis in deciding the defendant's motion, the defendant was not prejudiced. Accordingly, we conclude that the trial court did not abuse its discretion.

II

The defendant next claims that the trial court improperly denied his motion to suppress Aliberti's identification of the defendant. He claims that it was obtained by means of an impermissibly suggestive show-up identification procedure. We are unpersuaded.

After the police had located the red Yugo at 49 Goodwill Street, Fournier went to Patriot Petroleum to get Spaulding so that he could view the car. Spaulding was not at work, but Fournier learned that Aliberti had also observed the defendant and his car. Fournier then drove Aliberti to 49 Goodwill Street.

While Shanley was taking photographs, the defendant came out of his house to speak to the detective. Two detectives from the Southington police department arrived with the teller machine surveillance photographs. Several Meriden police officers also arrived to assist in the investigation. The defendant agreed to be photographed and consented to a search of his house.

Fournier and Aliberti arrived at the house, and Aliberti positively identified the vehicle as the car he had seen on October 18, 1994. He further identified the defendant as the driver of the car. The defendant claims

that Aliberti's identification was impermissibly suggestive because Aliberti was shown the red Yugo at approximately the same time that he saw the defendant.

It is important to note that the unnecessarily suggestive identification procedure complained of was not actually a "police procedure" at all. A police computer check of the registration of the red Yugo revealed that it was registered to Lynn Camp, the defendant's cousin. At the time Fournier went to Patriot Petroleum in search of Spaulding, he had no reason to know that the defendant had any connection to the red Yugo or that he was even present at 49 Goodwill Street. Aliberti was not brought to the scene to identify the defendant, but rather to identify the automobile. That the defendant happened to be present and happened to walk outside of the house in plain view of the officers and Aliberti cannot be said to be a police show-up procedure. Aliberti's identification of the defendant was inadvertent. Nevertheless, even assuming arguendo that the identification of the defendant was the result of a show-up procedure, the confrontation was not unnecessarily suggestive.

"It is well settled that [i]n determining whether a pretrial identification procedure violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. State v. Tatum, 219 Conn. 721, 727, 595 A.2d 322 (1991), quoting State v. Theriault, 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also State v. Ramsundar, 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). To prevail in his claim the defendant must demonstrate that the trial court erred in both of

its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . *State* v. *Hinton*, [196 Conn. 289, 293, 493 A.2d 837 (1985)]. *State* v. *Mayette*, 204 Conn. 571, 581, 529 A.2d 673 (1987). *State* v. *Pollitt*, 205 Conn. 132, 162, 531 A.2d 125 (1987). Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect." (Internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 685–86, 631 A.2d 271 (1993).

The out-of-court identification that the defendant claims was inadmissible is the one-to-one show-up between Aliberti and himself, which was obviously suggestive. Aliberti, after identifying the red Yugo, viewed the defendant. It would be natural for him to suspect that the defendant, a resident of the house at which the red Yugo was parked, had something to do with the crime. The confrontation, although suggestive, was not unnecessarily so because, as in *Wooten*, " 'the exigencies of the situation justified the procedure . . . .' *State* v. *Amarillo*, 198 Conn. 285, 293, 503 A.2d 146 (1986). The confrontation was not unnecessary because it was prudent for the police to provide the victim with the opportunity to identify her assailant while her memory was still fresh; see *State* v. *Middleton*, 170 Conn. 601, 608, 368 A.2d 66 (1976) ('prompt on-the-scene confrontations tend under some circumstances to ensure accuracy'); and because it was necessary to allow the police to 'eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay,' if the victim excluded the defendant as a suspect or was unable to identify him. *State* v. *Amarillo*, supra, 293. As we have remarked, '[a]n immediate viewing of the suspect may be justified where "it [is] important for the police to separate the prime suspect gold from

the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay." ' " *State* v. *Wooten*, supra, 227 Conn. 686–87.

In this case, it was prudent for the police to provide Aliberti with the opportunity to identify the driver of the red Yugo while his memory was still fresh. We conclude, therefore, that Aliberti's identification of the defendant was not unnecessarily suggestive. Accordingly, we need not address whether the identification was reliable under the totality of the circumstances.

## III

The defendant next claims that the trial court improperly denied his motion for judgment of acquittal because the evidence was insufficient to support the jury's verdict of guilty as an accessory to assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-8 and assault of a victim sixty or older in the second degree in violation of § § 53a-60b (a) and 53a-8. We disagree.

The defendant claims that the evidence was insufficient to prove that (1) he was present at the victims' house at the time of the attack and (2) he shared the attacker's intent to cause physical harm. Both claims are equally without merit.

"When reviewing sufficiency of the evidence claims, we employ a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. *State* v. *Salz*, 226 Conn. 20, 31, 627 A.2d 862 (1993). Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. *State* v. *Hooks*, 30 Conn. App. 232, 238, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993); *State* v. *Salz*, supra, 31. In this process of review, it does not diminish the probative force of the evidence that it

consists, in whole or in part, of evidence that is circumstantial rather than direct. [Id.]. The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. *State* v. *Ruscoe*, 212 Conn. 223, 245, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990)." (Internal quotation marks omitted.) *State* v. *Walton*, 34 Conn. App. 223, 229, 641 A.2d 391, cert. denied, 230 Conn. 902, 644 A.2d 916 (1994).

"It is well established that '[t]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide.' . . . *State* v. *Downey*, 45 Conn. App. 148, 154 694 A.2d 1367 [cert. denied, 242 Conn. 909, 697 A.2d 367] (1997); see also *State* v. *Torwich*, 38 Conn. App. 306, 314, 661 A.2d 113, cert. denied, 235 Conn. 905, 665 A.2d 906 (1995)." *State* v. *Smith*, 46 Conn. App. 321, 326, 699 A.2d 262 (1997).

" 'While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves

the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991).' *State* v. *Pinnock*, 220 Conn. 765, 770–71, 601 A.2d 521 (1992)." *State* v. *Romero*, 42 Conn. App. 555, 558, 681 A.2d 354, cert. denied, 239 Conn. 935, 684 A.2d 710 (1996).

First, the jury reasonably could have found that the defendant was present during the assault. The two assaults occurred between the time the house was burglarized and the time that Hoyt Pease was robbed. The jury found that the state had proven beyond a reasonable doubt that the defendant and his partner burglarized the Peases' residence. Similarly, the jury found that the state had proven beyond a reasonable doubt that the defendant and his partner robbed Hoyt Pease. The defendant does not challenge the sufficiency of the evidence as to either the burglary or robbery convictions. It was reasonable and logical for the jury to conclude that because the defendant was present for both the burglary and the robbery, he was present for the two assaults as well.

Second, the jury reasonably could have found that the defendant shared his partner's intent to cause serious physical injury. The evidence supports the inference that the defendant targeted Hoyt Pease while he was withdrawing money from the teller machine. The events following, including the allegation that his car was overheating and needed gasoline, were all part of this ruse. After stopping at Patriot Petroleum because his car needed gas, the defendant left the station without buying any gas and proceeded back toward the Peases' home in an opposite direction from Interstate 84. The defendant then contacted the man who drove the tan-colored car, and the two returned to the Peases' home with the intent to commit robbery.

Two witnesses saw the defendant's car and the tan car race up the Peases' driveway. While the defendant's

exact physical location at the time of the burglary, assaults and robbery is not known, the jury was entitled to infer that the defendant was present and that the two men acted together. The defendant conspired with the second man to burglarize the Pease residence and to commit robbery. The defendant was an accessory to the burglary and robbery.

At some point between the commission of the burglary and the robbery, the Peases both were struck with logs as they entered the garage. While neither saw the defendant inside the garage, the jury was entitled to infer that the defendant was present and out of sight of the two victims. On the basis of those facts, the jury was entitled to infer that the defendant orchestrated, encouraged, directed or authorized the actions of his partner and that the two were intent on committing the robbery by whatever means necessary.

From the evidence presented and all the reasonable inferences that it yields, the jury reasonably could have concluded that the defendant was guilty beyond a reasonable doubt. The trial court properly denied the defendant's motion for judgment of acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.