STATE OF CONNECTICUT *v.* KEVIN MYERS
(AC 32823)

Bishop, Alvord and Bear, Js.

Argued March 11—officially released June 21, 2011

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Kevin Myers, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1)[1] and two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A).[2] On appeal, the defendant claims that (1) the trial court improperly instructed the jury on (a) the legal definition of abduction and (b) the specific intent necessary to convict the defendant of kidnapping, and (2) the evidence was insufficient to support the defendant's conviction of two counts of kidnapping in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 1 a.m. on July 8, 2007, the victims, DL and AW,[3] returned to DL's apartment in East

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Hartford after spending the day attending Fourth of July barbeques. They intended to retrieve money for gasoline before attending an after-hours club. While inside the apartment building, they heard banging at the back door, and DL saw a person outside dressed in dark clothing and wearing a black mask. With the exception of the individual kicking the door, AW saw no other individuals in the neighborhood. After the banging stopped, the victims exited the building via the front door.

DL walked to her car in front of AW but saw "somebody creep up behind [AW] with a knife [wearing] all black, saying, [g]et the fuck in the car." The masked defendant held AW, with the knife at her neck.[4] AW had possession of the keys, but was unable to open the car from the passenger side, so she "threw the keys on top of the car," and DL opened the doors. At the defendant's command, DL got into the car because she "felt like [she] had no choice" and because she "was driving, [AW] threw [her] the keys, and he had a knife . . . ." DL entered the driver's side of the car, and the defendant and AW got into the backseat of the car. AW gave the defendant the contents of her pocket, $6, and asked what he wanted.[5] He told DL to drive, and directed her to an abandoned parking lot. During this time, DL saw AW performing oral sex on the defendant through the rearview mirror, which the defendant "made [her]" do and which she did because she was "scared [and]

---

[4] AW testified that she did not know whether the metal item pressed to her neck was a gun or a knife before she entered the car.

[5] It is unclear exactly where the victims were when AW asked the defendant what he wanted and gave him her money. DL testified that this occurred upon entering the car. AW testified first that "before we got in the car, I'm, like, what do you want? What do you want? Like, do you want money or whatever . . . so, I went in my pocket. I only had, like, six singles in my pocket, so I just gave it to him cause I didn't know what he wanted." But she also testified to asking him what he wanted repeatedly throughout the offense.

didn't know what to do." AW testified that she "was in fear for [her] life, and [she] did what he wanted . . . ."

When the car reached the lot, the defendant told DL to pull over, turn off the engine and the headlights, and get into the backseat. She climbed over the front seat to enter the backseat, while the defendant held the knife up in one of his hands.[6] At this time, the defendant demanded anal sex. As the defendant subjected AW to vaginal intercourse, she screamed, which prompted DL to attack the defendant. AW was able to escape from the car and run to a house with its lights on, but "there was nobody home . . . ." She testified that aside from this house, the neighborhood was "pitch black" and that at the second house the resident said that it "wasn't [his or her] problem . . . ." AW continued until she found a house in which the occupants were willing to allow her to enter and to call 911. The defendant also fled, allowing DL to close the doors, lock the car, call 911 and drive away from the scene.

Meanwhile, East Hartford police Sergeant Edward Perkins was driving in the neighborhood and noticed a male in dark clothing sprinting across the street, the male increasing his speed upon seeing the marked police car. With the help of another officer, Perkins apprehended the male, who was identified as the defendant. Simultaneously, Perkins was notified of a sexual assault in the vicinity, reported by AW, and he met with AW, whose description of the perpetrator matched that of the defendant. As the defendant was being arrested, the police dispatcher received DL's call. The dispatcher convinced DL to travel to the police station to make a statement.

AW was taken to a hospital, but DL was not. A sexual assault evidence kit was administered on AW. The

---

[6] Both AW and DL testified that when DL moved into the backseat, she also was forced to give the defendant oral sex at knifepoint. The jury, however, found the defendant not guilty of the sexual assault charge as to DL.

police investigated the crime scene and found a gold earring with DL's name on it, as well as "a couple of box cutter type knives" close to the scene. Although none of the latent prints taken from the car were matched to the defendant, a sample from AW's vaginal swab showed results "consistent with [the defendant] or another member of the same paternal lineage being the source . . . ."

The defendant was charged with two counts of sexual assault in the first degree and two counts of kidnapping in the first degree.[7] Both victims testified, as did the officers and crime scene investigators involved in the case. At the close of the state's case and after the jury's verdict, the defendant moved for a judgment of acquittal, which was denied. The defendant was convicted of one count of sexual assault in the first degree and two counts of kidnapping in the first degree and was sentenced to eighteen years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the defendant first claims that the court improperly instructed the jury on (1) the legal definition of abduction and (2) the specific intent necessary to convict the defendant of kidnapping. We conclude that the defendant waived the claim with respect to the definition of abduction and that it is not reasonably possible that the specific intent instruction misled the jury.

The following additional facts are relevant to the defendant's claims of instructional error. Prior to finalizing the jury charge, the court gave the state and the defense a copy of the first half of the charge on February 17, 2009, which included the entire charge absent the specific offenses, and provided counsel the

---

[7] The operative information was filed with the court on February 19, 2009.

balance of the instructions regarding the specific offenses on February 18, 2009. On February 19, 2009, both the state and the defendant participated in a charge conference, after which a second draft was produced.[8] Neither party took exception to the final charge. The jury was provided instructions from the court in three instances: (1) the court read aloud, verbatim, the approved, written jury charge; (2) the jurors were provided a copy of the jury charge to which they could refer during deliberations; and (3) the court responded to jury inquiries made during deliberations. The relevant portion of the charge, relating to the kidnapping charges, cited § 53a-92, providing in relevant part that "[a] person is guilty of kidnapping in the first degree when he abducts another person and restrains the person abducted with intent to violate or abuse her sexually." See footnote 2 of this opinion. The charge included the statutory definition of "[a]bduct [which] means to restrain a person with the intent to prevent her liberation by using or threatening to use physical force or intimidation." See General Statutes § 53a-91 (2). Both "physical force" and "intimidation" were defined as holding their "everyday meaning," and, thus, the charge provided that intimidation "requires that the defendant's words or actions place the complainant in a state of fear."

The element of intent again was emphasized, the charge providing that "the defendant [must have] abducted the complainant with the specific intent to violate or abuse her sexually. . . . It is not necessary [in a kidnapping charge] that any actual sexual violation or abuse be proved, as long as you determine that the defendant intended to violate or abuse the complainant sexually, and abducted and restrained the complainant with that specific intent. Please refer back to the

[8] The second draft was changed at the request of the defendant as to the instruction regarding identification, which is not at issue in this appeal.

instruction on specific intent." Immediately after this instruction stating explicitly the simultaneous nature of the intent and the abduction, the charge provided in summary that "the [s]tate must prove beyond a reasonable doubt that the defendant: (1) restrained the complainant; (2) did so without her consent; (3) specifically intended to prevent her liberation; (4) did so by using or threatening to use physical force or intimidation; and (5) that he intended to violate or abuse the complainant sexually." After the court read the jury charge, it again asked if counsel had any exceptions to the charge, and the defense counsel answered, "No, Your Honor."

During deliberations, the jury posed three questions.[9] With regard to what constituted "the use or threat of physical force or intimidation," the jury asked, "the use of force or the threat of the use of force, is [that] threat of the use of force on—if one complainant is influenced by the threat of the use of force on another complainant as opposed to the threat of the use of force on him or herself, does that qualify" (intimidation question)? The jury also inquired: "[t]he degree to which intent exists, is it reasonable that the intent could have turned from general intent to commit a crime to the intent to commit a sexual assault during the process? So, my specific hypothetical is, if there was no intent to assault [DL] until the car was stopped, and then if the ordering of [DL] to move from the front seat to the backseat was with the intent to cause a sexual assault, would that movement . . . constitute the movement required for the kidnapping charge?[10] . . . [D]id it have to be planned out the whole time or could it have been a

---

[9] The state argues that the three questions posed by the jury were interrelated, based on a single hypothetical. Because we conclude that the supplemental instructions did not mislead the jury when read in isolation, it is unnecessary to consider this interpretation.

[10] The court did not address directly the specific hypothetical posed in this question.

somewhat spontaneous change in intent during the event" (specific intent question)?

The court dismissed the jurors after they related their questions and discussed the answers with the attorneys for both parties. In discussion with the attorneys, the court stated that, in response to the intimidation question, "we're universally agreed that the answer to that is no . . . ." The defense responded in the affirmative and stated that "it's in the instruction. As long as we're giving them information which is already in the instruction, I'm okay with that. I think if we start supplementing it with additional explanation, I think that's when we could get into problems." Further, the court stated to both attorneys that it would provide the following answer to the specific intent question: "the answer is, essentially, yes, there's no minimum time." Neither attorney responded directly to this statement.

The jurors returned, and the court stated that "one [question posed by the jury] involves the use of force or threat on another complainant, if it influenced the complainant not threatened. The short answer to that is no. . . . I would again refer you to the [written charge defining the use or threat of use of force or intimidation]. . . . The state must prove the defendant prevented the liberation of the complainant by using or threatening to use physical force or intimidation. . . . And that would be force against the complainant or acts that caused the complainant to be intimidated." The foreperson indicated that the jury, in fact, was following along with the written charge as instructed by the court.

The court also stated that "there is no time limit to the formation of specific intent; it may be instantaneous. Whether it comes from nowhere, or, you know, it's just a spontaneous idea . . . whether one is engaging in a general intent offense or whether one is just walking

down the street. You can have instantaneous specific intent."[11] The foreperson indicated affirmative understanding of the explanation. The court then dismissed the jury and asked both the defendant and the state if there were "[a]ny exceptions, criticisms [of the court's answers to the jury's questions]?" The defense counsel stated, "[n]o."

## A

The defendant's first claim, which is that the trial court improperly instructed the jury on the legal definition of abduction, arises from the court's response to one of the jury questions. The defendant claims that, inter alia, "[t]here is a reasonable possibility that [the court's answer to the intimidation question] misled the jurors into believing that, if the defendant's words or acts directed at AW influenced or intimidated DL, then the state had met its burden . . . ."[12] The state argues that the defendant waived any claim regarding the adequacy of this instruction. In response, the defendant contends that his counsel did not participate meaningfully in crafting the supplemental instruction and that "the defendant expressly alerted the court of the danger of supplementing the language of § 53a-91." We agree with the state, as we believe that the additional comments made by the court "essentially repeated"[13] the

[11] During oral argument in this court, the defense counsel acknowledged that this is, "in the abstract, a valid answer."

[12] The defendant contends in his principal brief that instead of "that would be force against the complainant or acts that caused the complainant to be intimidated," the court was required to state that "that would be force against the complainant or acts *against the complainant* that caused the complainant to be intimidated"; (emphasis in original; internal quotation marks omitted); in order to clarify that the intimidation must be directed toward the victim who was being abducted.

[13] See *State* v. *Foster*, 293 Conn. 327, 341, 977 A.2d 199 (2009) (defendant waived objection to supplemental instruction in part because it "essentially repeated" portion of initial instruction defendant had approved), cited in *State* v. *Akande*, 299 Conn. 551, 560, 11 A.3d 140 (2011), released simultaneously with *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011).

instructions that the court had already given and to which the defendant had agreed.

Our Supreme Court recently held in *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), that "when the trial court provides counsel with a copy of the proposed instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. Accordingly, in this case, any challenge to the written charge or the reading thereof was waived because (1) the defendant was provided with a copy of the draft jury charge, (2) the defendant had a meaningful opportunity to review it, (3) there was a conference with the court during which the court solicited comments, (4) the parties made suggestions and modifications resulted, and (5) the defendant affirmatively accepted the charge. See id.

Thus, we must assess only whether the defendant waived a claim challenging the supplemental answer provided in response to the jury's intimidation question.[14] We are not persuaded that stating that "[t]he

[14] This court and our Supreme Court have found implied waiver of challenges to supplemental jury instructions. See, e.g., *State* v. *Akande*, 299 Conn. 551, 562, 11 A.3d 140 (2011) (defense waived claim of improper instruction when "defense counsel had a meaningful opportunity to review the supplemental instructional language and because the jury's specific request was sufficient to focus defense counsel's attention on the [portion of the instructions regarding the elements of the crime that the defendant challenges]"); *State* v. *Foster*, 293 Conn. 327, 339–42, 977 A.2d 199 (2009) (defense waived claim of improper instruction on alibi defense by expressing satisfaction with initial alibi instruction, asking court to remind jury that it must determine if defendant was present at scene of crime, and failing to object to court's supplemental instruction essentially repeating part of initial alibi instruction requested by counsel); *State* v. *Hankerson*, 118 Conn. App. 380, 388–89, 983 A.2d 898 (2009) (defense waived claim of improper instruction when, following jury's written inquiry, court discussed portion of initial

short answer to that is no," in addition to the court's brief explanation,[15] departed with any significance from the original charge as written, which had been approved by the defendant under circumstances previously discussed. We conclude, therefore, under the facts of this case, that the defendant waived the claims of instructional error with respect to the jury instructions on the definition of abduction.

## B

The defendant also argues, inter alia, that the trial court improperly instructed the jury on the specific intent necessary to find him guilty of kidnapping because the court's answer to a jury question blurred the distinction between the different intents associated with kidnapping. He also contends that when "summarizing the charge, the trial court 'dropped' the requirement that the state must prove that the defendant had the intent to violate or abuse the [victims] sexually at the time of the abduction." We conclude that it is not reasonably possible that the specific intent instruction misled the jury.

The defendant acknowledges that he took no exception to the portions of the charge challenged on appeal. The defendant requests review pursuant to *State* v.

charge with counsel, counsel acquiesced to substance of instruction, and defense did not object when court delivered supplemental instruction essentially repeating portion of initial charge challenged on appeal), cert. denied, 298 Conn. 932, 10 A.3d 518 (2010).

[15] In the original charge, the court stated that the state must prove that the defendant prevented "the liberation of the complainant by using or threatening to use physical force or intimidation." It further defined intimidation as having its "everyday meaning and requires that the defendant's words or actions place the complainant in a state of fear." In the supplemental charge, the court stated that "[t]he state must prove the defendant prevented the liberation of the complainant by using or threatening to use physical force or intimidation. . . . And that would be force against the complainant or acts that caused the complainant to be intimidated."

*Golding*, 213 Conn. 233, 567 A.2d 823 (1989). A defendant can prevail on an unpreserved constitutional claim under *Golding* "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. We conclude that the claims are reviewable because the record is adequate for review and the claims are of constitutional magnitude. See *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002) ("[a]n improper instruction on an element of an offense . . . is of constitutional dimension" [internal quotation marks omitted]). We further conclude, however, that the defendant's claims fail under *Golding*'s third prong.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are

sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Nelson*, 118 Conn. App. 831, 858, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010).

The supplemental explanation as to the formation of specific intent is a correct statement of the law and must be read in context with the entirety of the jury charge. The court described twice in its charge that the defendant had to abduct the victims with concurrent intent to abuse the victims sexually. We are not persuaded that, by summarizing the elements of the offense or answering the question as it did, the court undermined its previous instructions as to required timing, and, thus, it is not reasonably possible that the jury was misled. Our Supreme Court has stated previously that "[a]s long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . [a reviewing court] will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 455.

In this case, the totality of the court's jury charge, considered in conjunction with the fact that the jurors could consult the written copy of the court's charge, eliminated the possibility that any reasonable juror could have interpreted the instructions as not requiring the specific intent at the time of the abduction. Our reasoning applies whether the jury construed the abduction as having occurred at the time the victims were forced into the car or at the time DL moved within the car. Accordingly, this claim fails under the third prong of *Golding*.

## II

The defendant next claims that the evidence was insufficient to support his conviction of two counts of

kidnapping in the first degree. Specifically, the defendant claims that (1) there was insufficient evidence to prove beyond a reasonable doubt that he restrained DL with the intent to prevent her liberation by using or threatening to use physical force or intimidation and (2) there was insufficient evidence to prove beyond a reasonable doubt that he abducted either victim with the intent to sexually assault them at the time of the abduction.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *McGee*, 124 Conn. App. 261, 272, 4 A.3d 837, cert. denied, 299 Conn. 911, 10 A.3d 529 (2010).

A

The defendant claims that there is insufficient evidence to sustain his conviction of first degree kidnapping because the state did not present sufficient evidence for the jury to conclude that he restrained DL

with the intent to prevent her liberation by using or threatening to use physical force or intimidation. We disagree.

To find the defendant guilty of kidnapping in the first degree in violation of § 53a-92, it was necessary for the jury to find, beyond a reasonable doubt, that the defendant had abducted the victim and restrained her with the intent to abuse her sexually. See footnote 2 of this opinion. Section 53a-91 (2) defines "abduct" as "to restrain a person with intent to prevent his liberation by . . . (B) using or threatening to use physical force or intimidation." The defendant claims that the evidence was insufficient to show that DL got into the car because of the use or threat of force or intimidation. The defendant emphasizes that DL never testified that he threatened to use force on her.

In the present case, DL testified that at approximately 2 a.m. the masked defendant, while wielding a knife, told her and AW to "[g]et the fuck in the car," and that she did so because she "felt like [she] had no choice [because] . . . he had a knife and it was both of us." The defendant was between DL and the apartment building she had just exited, and AW testified that the neighborhood was "pitch black" and that there were no other parties in the locale. Consequently, DL's testimony alone is sufficient for the jury reasonably to have concluded that she was abducted at the time she entered the car.[16]

B

The defendant also claims that there was insufficient evidence to prove beyond a reasonable doubt that he

[16] This court previously has stated that a jury reasonably could have concluded that an unarmed defendant abducted a victim based on intimidation not related directly to the presence of a weapon. See State v. Cotton, 77 Conn. App. 749, 777–78, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003).

abducted either victim with the intent to sexually assault them.

As to the question of intent, "[i]t is well established that [t]he question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Watson*, 50 Conn. App. 591, 605, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132, 646 A.2d 169 (1994).

As described in part II A of this opinion, the jury had before it evidence that at almost 2 a.m. the knife-wielding defendant approached DL and AW and held the knife to AW's neck. AW provided the defendant with the contents of her pockets, but that did not satisfy him, and the victims were compelled to enter the car. DL testified that "[AW] gave him money, [and] he didn't want money." They were forced into a car almost immediately upon the defendant's approach. Both victims testified that AW was forced to perform oral sex within moments of entering the car. The defendant used the

car to move the two victims to a dark, abandoned parking lot. At no time did the defendant demand anything aside from sex. The jury was not required to conclude that he did not have the requisite intent at the time of the abduction, simply because the defendant did not demand sex until he entered the car.

It is not the role of this court to second-guess the jury's conclusion that the defendant had the requisite intent to sexually assault the victims at the time they were abducted. The defendant's conduct was sufficient to allow the jury reasonably to find that he intended to abduct the victims for the purpose of sexual assault.[17]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] The defendant also claimed that there was insufficient evidence to support a finding that he kidnapped DL at the time she was ordered into the backseat, or at the time she was in the backseat, citing *State* v. *Salamon,* 287 Conn. 509, 949 A.2d 1092 (2008), for the second argument. It is unnecessary to reach these claims because we construe the evidence in the light most favorable to sustaining the verdict; *State* v. *McGee,* supra, 124 Conn. App. 272; and conclude that the evidence is sufficient to support the kidnapping verdict based solely on the events occurring at the time both victims entered the car.