******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KENNY HOLLEY
(AC 37166)

DiPentima, C. J., and Keller and Prescott, Js.

*Argued April 13—officially released October 20, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John F. Fahey*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Kenny Holley, appeals from the judgment of conviction, rendered following a jury trial, of felony murder in violation of General Statutes § 53a-54c, home invasion in violation of General Statutes § 53a-100aa (a) (1), conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 (a) and 53a-100aa (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), and robbery in the first degree in violation of General Statutes § 53a-134 (a) (2).[1] The defendant claims that (1) the evidence did not support his conviction of robbery in the first degree, burglary in the first degree, or felony murder; (2) the court violated his right to present a defense when it precluded him from presenting his version of the facts related to certain injuries sustained by another person involved in the crimes; (3) the court made several errors in the admission of evidence; and (4) the court improperly denied his motion for a mistrial.[2] We reverse the judgment of the trial court and remand the case for a new trial.

On the basis of the evidence presented at trial, the jury reasonably could have found that, at the time of the events at issue, the victim, William Castillo, lived in an apartment in East Hartford with his girlfriend, Tami Schultz. The victim earned money from selling sneakers both from his automobile and from his residence. At approximately 3:15 p.m. on June 30, 2009, while Schultz was out shopping, the defendant and Donele Taylor entered the victim's residence. A violent struggle involving the victim ensued, during which both Taylor and the victim sustained physical injuries. Notably, the victim bit Taylor on his right wrist. Before the defendant and Taylor left the victim's residence, which they ransacked in search of valuables, the victim sustained multiple gunshot wounds.

When the defendant and Taylor fled the victim's residence, the defendant was in possession of property belonging to the victim, specifically, cash and a shoe box. At 3:24 p.m., the victim attempted to dial 911 on his cellphone but he was unable to do so and dialed "922" instead. He perished on his kitchen floor from a gunshot wound in the area of his left chest. A neighbor of the victim, alerted to the sound of uncharacteristically loud music, fighting, gunshots, and pleas for help originating from the victim's residence, called 911 at 3:25 p.m. By 3:30 p.m., the police arrived at the scene, where they discovered the lifeless victim.

Immediately upon leaving the victim's residence, the defendant and Taylor proceeded to a nearby bus stop that was one-tenth of a mile from the crime scene, from which, at 3:22 p.m., they boarded a bus that transported them to downtown Hartford. At this time, the defendant was carrying a backpack that contained the cash and

a shoe box. A fellow passenger overheard Taylor comment to the defendant that Taylor had been bitten by a dog, and the defendant was overheard remarking that "it was a big dog." Images of the defendant and Taylor running toward the bus stop were captured by a video surveillance camera located at a nearby convenience store, and images of the defendant and Taylor while they were on the bus were captured by a video surveillance camera located on the bus. In the video from the bus, the defendant appears to remove cash from his backpack and appears to hand something to Taylor from his backpack.

By disseminating to the public some of the still images of the defendant and Taylor from the surveillance footage captured on the bus, the police gained information about their identities. When the police interviewed Taylor on July 16, 2009, police observed injuries on or about his hands. Following an unrelated shooting incident in Hartford, the police came to possess a .22 caliber Beretta and determined that it previously had been owned by Taylor. Forensic analysis of the gun and of shell casings found at the crime scene involving the victim linked the gun, and thus Taylor, to the crimes. Moreover, forensic analysis of DNA samples from Taylor and of DNA obtained from the brim of a baseball cap that was found at the crime scene linked Taylor to the crimes. Having discussed some of the facts and evidence underlying the state's case, we will discuss additional relevant facts as they relate to the specific claims raised in the present appeal.

I

First, the defendant claims that the evidence did not support his conviction of robbery in the first degree, burglary in the first degree, or felony murder.[3] We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining

whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

A

With regard to the conviction of robbery in the first degree, the defendant argues that the state failed to prove beyond a reasonable doubt that "[he] used or threatened the use of physical force on the victim for any reason, let alone for the purpose of accomplishing the larceny." The defendant argues that "[t]o have arrived at its decision, the jury would have had to resort to speculation and conjecture, and to have drawn unwarranted inferences from the facts presented." The defendant acknowledges that the evidence permitted a finding that Taylor entered the victim's residence, the victim bit Taylor on the wrist during a struggle, and that "[a]t some point, the victim was shot." The defendant accurately observes that the state did not present any physical evidence to demonstrate that he had been in the victim's residence. The defendant argues that, to the extent that the state presented evidence that "[a] teen" got on the bus with Taylor, was carrying a backpack, and commented on " 'a big dog,' " such evidence merely supported a finding that this person was present when the victim bit Taylor. The defendant does not claim that the evidence did not demonstrate his guilt as an *accessory*. His analysis of the claim is limited to demonstrating that the state was limited to proving his criminal liability under § 53a-134 (a) (2) solely as a *principal*, and that it failed to do so.

The state disagrees that it was limited to proving the defendant's criminal liability as a principal. The state argues that to obtain a conviction under an accessorial theory of liability, the law does not require that the state *formally* charge an accused as an accessory. The state argues that the information put the defendant on notice that it would attempt to demonstrate criminal liability under alternate theories, its evidence demonstrated that the state attempted to prove the defendant's criminal liability as an accessory, and the evidence amply demonstrated that the defendant, as an accessory, was guilty of robbery in the first degree.

Section 53a-134 (a), with which the defendant was charged, provides: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ." General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-119 defines larceny: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

In the state's long form information, it charged the defendant in count six with robbery in the first degree in violation of § 53a-134 (a) (2) as follows: "The said Senior Assistant State's Attorney further accuses [the defendant] of the crime of robbery in the first degree in violation of Connecticut General Statutes § 53a-134 (a) (2) and alleges that on or about June 30, 2009, at or near [the victim's residence in East Hartford], at approximately 3:15 p.m., the defendant, in the course of committing a larceny, used and threatened the immediate use of physical force upon another person; to wit: William Castillo, for the purpose of preventing and overcoming resistance to the taking of the property and to the retention thereof immediately after the taking and in the course of the commission of the crime of robbery or of immediate flight therefrom, he or another participant in the crime, to wit: Donele Taylor, was armed with a deadly weapon."

The state specifically charged the defendant as an accessory in the context of count four, alleging that he committed burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (2) *and* 53a-8 (a). In

several other counts, the state alleged that, with regard to the events underlying all of the charges, the defendant had acted in conjunction or as a coconspirator with Taylor. Thus, in count one, the state alleged that the defendant committed felony murder in that "the defendant, acting with another person; to wit: Donele Taylor, committed or attempted to commit a felony; to wit: burglary and robbery, and in the course of and in furtherance of such crimes or of flight therefrom, he or another participant caused the death of [the victim]." In count two, the state alleged that the defendant committed home invasion in that "in the course of committing the offense, acting with another person; to wit: Donele Taylor, he or another participant in the crime committed or attempted to commit a felony against the person of [the victim] . . . ." Moreover, in counts three, five, and seven of the information, the state alleged that the defendant and Taylor had engaged in a conspiracy to commit the crimes of home invasion, burglary in the first degree and robbery in the first degree.

Although, in connection with the robbery charge, the state did not refer to accessorial liability or to our accessorial liability statute, § 53a-8 (a),[4] its failure to do so did not preclude the state from obtaining a conviction by means of evidence that the defendant acted as an accessory to another, namely, Taylor. "It is well settled that under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or to do any act forming a part thereof, then the [conviction] must stand. . . . Connecticut long ago adopted the rule that there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility. . . . The modern approach is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . Connecticut has taken the same approach through General Statutes § 53a-8. . . . There is no meaningful distinction between principal and accessory liability; they are simply theories for proving criminal liability. . . . [A] defendant may be convicted as an accessory even though he was charged only as a principal . . . ." (Citations omitted; internal quotation marks omitted.) *State v. Hamlett*, 105 Conn. App. 862, 867–69, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008); see also *State v. Smith*, 212 Conn. 593, 606, 563 A.2d 671 (1989) ("[u]nder Connecticut law, a defendant may be convicted as an accessory even though he was charged only as a principal as long as the evidence presented

at trial is sufficient to establish accessorial conduct").

"A defendant cannot be convicted of being an accessory. Proving guilt as an accessory under § 53a-8 is an alternative way in which the state may demonstrate a defendant's liability for a criminal act. . . . Liability does not turn on whether he was found to be a principal or an accessory. . . . Accordingly, a defendant who is charged with an offense should be on notice that he may be convicted as an accessory. . . .

"Nevertheless, due process considerations preclude a court from instructing a jury that it may convict a defendant under a theory of accessorial liability in certain circumstances. Inherent in the constitutional mandate that a defendant be advised of the nature and cause of the accusations against him is that the defendant be on notice of the nature of the state's prosecution. The state cannot present its case on the theory of principal liability and then, without providing notice to the defendant, seek near the conclusion of the trial to convict the defendant under a theory of accessorial liability." (Citations omitted; internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 214–15, 792 A.2d 856 (2002).

The state referred to Taylor in the context of count six, in which it charged the defendant with robbery in the first degree, as well as in the context of five of the other six counts, all of which involved the discrete events of June 30, 2009, involving the victim. The several counts of the state's information, when read together, provided the defendant notice that the state could seek a conviction on a ground of accessorial liability. See, e.g., *State* v. *Davis*, 154 Conn. App. 216, 229, 107 A.3d 962 (2014) (rejecting claim that defendant lacked notice that state could seek conviction on ground of accessorial liability), cert. denied, 315 Conn. 918, 107 A.3d 961 (2015). The several counts of the information reflected the state's intent to prove that the defendant and Taylor were confederates in the commission of the several crimes at issue. Moreover, the manner in which the state presented its case reflected that the state was not confining its theory of the case to one based on principal liability. The state presented physical evidence to demonstrate that Taylor was present in the victim's residence, as well as evidence that Taylor exhibited physical injuries consistent with an altercation with the victim. The state presented evidence that the murder weapon, later recovered by the police in connection with unrelated criminal activity, had been owned by Taylor. The state focused on the activities of the defendant and Taylor immediately following the incident, presenting evidence that they boarded a bus immediately following the crimes, that the defendant was in possession of some of the victim's stolen property, and that the defendant had knowledge of the fact that Taylor had sustained physical injury during a physical alterca-

tion with the victim. Against this evidentiary backdrop, it was reasonable to presume that the state would pursue a theory of accessorial liability.

As part of its argument that the state was limited to sustaining a conviction under a theory of principal liability, the defendant also argues that a conviction on the robbery charge cannot be premised on accessorial liability because the state failed to request a jury instruction on accessorial liability in connection with the robbery charge and, in the context of the robbery charge, the court did not instruct the jury that it could find the defendant guilty under such a theory of liability. Certainly, a reviewing court may not uphold a conviction premised on accessorial liability if the court foreclosed the jury from basing its guilty verdict on that theory. See *State* v. *Faulkner*, 48 Conn. App. 275, 277, 709 A.2d 36 (1998) (noting in review of sufficiency of evidence to support conviction as accessory that court instructed jury as to both principal and accessorial liability); *State* v. *Channer*, 28 Conn. App. 161, 166, 612 A.2d 95 (noting in review of sufficiency of evidence that reviewing court limited to considering whether evidence supported finding that defendant acted as principal because trial court did not instruct jury as to accessorial liability), cert. denied, 223 Conn. 921, 614 A.2d 826 (1992).

In the present case, the court began its charge by instructing the jury with regard to general principles including but not limited to the presumption of innocence, the state's burden of proof, and the different types of evidence it may consider. Before discussing the essential elements of each offense with which the defendant was charged, the court delivered what it deemed to be "preliminary" instructions concerning the concepts of proximate cause, motive, identity, and intent. The court instructed the jury that it must consider each count separately and that, with regard to the element of causation, "[t]he state must [prove] beyond a reasonable doubt that the defendant, *as a principal or as an accessory*, proximately caused any injury to [the victim]." (Emphasis added.) With regard to the element of identity, the court stated in relevant part: "The state has the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crimes alleged. You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed, *here, as either a principal or an accessory*, the crimes, or you must find the defendant not guilty." (Emphasis added.)

The court then instructed the jury with regard to the offense of burglary in the first degree. After discussing the elements of that offense, the court stated in relevant part: "In this count, the defendant has been charged as an accessory. A person is criminally liable for a criminal act if he directly commits it or if he is an accessory in the

criminal act of another. The statute defining accessorial liability reads in pertinent part as follows:

"A person acting with the mental state required for the commission of an offense who solicits, requests, commands, importunes, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"This statute does not connect the five acts specifically with the word and, but separates them by the word or. A person is an accessory if he solicits or requests or commands or importunes or intentionally aids another to engage in the conduct that constitutes an offense. Solicit means to tempt or entice someone to do wrong. Importune means to demand or urge. Aid means to assist, help, or support. A person acts intentionally with respect to a result when his conscious objective is to cause such result. Intentionally aid, therefore, means to act in any manner, the conscious objective of which is to assist, help, or support. Again, please refer to the instruction concerning specific intent.

"If the defendant did any of these things as specified in the statute, he is guilty of burglary in the first degree as though he had directly committed it or participated in its commission. To establish the guilt of a defendant as an accessory for assisting in the criminal act of another, the state must prove criminality of intent and community of unlawful purpose. That is, for the defendant to be guilty as an accessory, it must be established that he acted with the mental state necessary to commit burglary in the first degree, and in furtherance of that crime he solicited, requested, commanded, importuned, or intentionally aided the principal to commit the burglary in the first degree.

"Evidence of mere presence as an inactive companion or passive acquiescence or the doing of innocent acts, which, in fact, aid the commission of the crime is insufficient to find the defendant guilty as an accessory under the statute. Nevertheless, it is not necessary to prove that the defendant was actually present or actually participated in the actual commission of the crime of burglary in the first degree."

After concluding its instruction with regard to burglary in the first degree, the court instructed the jury with regard to the elements of robbery in the first degree, the offense at issue in the present claim. The court set forth the essential elements of the crime, instructing the jury that the state bore the burden of proving beyond a reasonable doubt "that the defendant was committing a larceny . . . that he used physical force against the owner of property to obtain the property and . . . that he or another participant was armed with a deadly weapon." In the context of this instruc-

tion, the court did not refer to accessorial liability.

In considering the court's charge, we are mindful that "[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the case. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Terwilliger*, 314 Conn. 618, 648, 104 A.3d 638 (2014). Although, in the context of the instruction related to the robbery charge, the court did not distinctly instruct the jury that it could find the defendant guilty of robbery in the first degree under an accessorial theory of liability, we conclude nonetheless that a fair reading of the court's charge in its entirety, in light of the evidence before the jury, submitted the charge to the jury on a theory of accessorial liability.

As an initial matter, nothing in the court's instructions related to the robbery charge suggested that the jury was *precluded* from reaching a verdict under a theory of accessorial liability. When the court delivered its preliminary instructions to the jury, prior to instructing the jury with regard to the essential elements of any of the offenses, the court twice referred to the defendant's liability as a principal or an accessory. In its instruction concerning identity, it instructed the jury to consider whether the state proved that the defendant committed the "*crimes*" in this case as a principal or as an accessory. (Emphasis added.) The court set forth a thorough instruction concerning accessorial liability in the context of the first offense that it addressed, burglary in the first degree, and it did not state that its instruction could not be applied to any other offense. Despite the fact that the court addressed accessorial liability solely in the context of the burglary charge, prior to a discussion of any of the other offenses, we are persuaded that in light of the court's preliminary instructions, as well as the evidence that indisputably pointed to the defendant's guilt on the intimately related charges of burglary and robbery as an accessory, it is likely from the charge as given that the jury would have understood the accessorial liability instruction to apply to the robbery charge, as well. We recognize that the state presented evidence from which the jury reasonably could have found that the defendant was present in the victim's residence during the events at issue, he carried items stolen from the victim's residence away from the scene, he and Taylor fled to Hartford immediately after the events at issue, and that, rather than expressing any dissatisfaction with the events that led to the victim's death, he and Taylor casually discussed these violent events while riding together on the bus that delivered them to Hartford.

In reaching our conclusion, we are guided by *State v. Foshay*, 12 Conn. App. 1, 26–28, 530 A.2d 611 (1987), in which this court concluded in a sufficiency of the evidence analysis that, despite the fact that the trial court had instructed the jury with regard to accessorial liability solely in the context of its burglary charge, the jury would have understood the accessorial liability instruction to have applied to the intimately related charge of larceny. In *Foshay*, this court explained: "Although the remainder of the court's charge was structured so that the accessory liability concept was specifically applied to the evidence in the case only in the context of the burglary offense and prior to any instruction on the elements of the larceny offense, it is likely from the charge as given that the jurors understood accessory liability to apply to both counts. This is so because their attention was drawn to both counts when the concept was explained, and because the evidence in the case indisputably pointed to the defendant's guilt on both intimately related charges only as an accessory. Although it would have been preferable to have linked the accessory instruction more specifically to the instruction on the larceny offense, reviewing the instructions as a whole and considering them from the standpoint of their probable effect upon the jury in guiding them to a correct verdict, we cannot say that the jury was without adequate legal instruction on the applicability of accessory liability, as contained in General Statutes § 53a-8, to the larceny offense of which the defendant was convicted." Id., 27–28.

The defendant's sufficiency claim is based on his argument that the jury was confined to determining whether he committed the crime as a principal and not as an accessory. Because we conclude that the court submitted the case to the jury on a theory of accessorial liability, as well as on a theory of principal liability, we reject the defendant's claim.[5]

B

With regard to the conviction of burglary in the first degree, the defendant argues that the evidence did not support a finding that: (1) under a principal theory of liability, he inflicted or attempted to inflict bodily injury on the victim, or (2) under an accessorial theory of liability, he solicited, requested, commanded, importuned or intentionally aided another who engaged in conduct constituting the burglary. We disagree.

The defendant acknowledges that by means of the evidence of Taylor's injuries following the events at issue, the "dog bite" conversation that occurred on the bus, Taylor's ownership of the murder weapon, and the results of the DNA testing of the baseball cap found in the victim's residence, the jury could have found that Taylor was in the victim's apartment, struggled with the victim, and shot the victim. The defendant argues

that from the evidence of his presence on the bus with Taylor immediately following the events at issue, the "dog bite" conversation on the bus, and his possession of the shoe box, the jury reasonably could have found that "[he] was in the apartment and saw Taylor and the victim struggle."

The defendant argues that the evidence, however, did not support a finding that he acted as a principal in this crime by participating in a struggle with the victim or shooting the victim. Moreover, the defendant argues that the evidence did not support a finding that he acted as an accessory to Taylor's criminal conduct in the victim's residence. He argues that, from the facts in evidence, "the jury could not have reasonably and logically concluded that the defendant solicited, requested, commanded, importuned or intentionally aided Taylor, who intentionally, knowingly or recklessly inflicted bodily injury on the victim."

"A person is guilty of burglary in the first degree when . . . (2) such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone . . . ." General Statutes § 53a-101 (a). Here, the state's theory of the case was that the defendant intended to commit burglary in the first degree. As set forth in part I A of this opinion, a person, acting with the mental state required for the commission of the crime, may be held liable as an accessory if he "solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." General Statutes § 53a-8 (a).

The defendant acknowledges that the state presented evidence that Taylor entered the victim's residence, struggled with the victim, and shot the victim. Also the defendant acknowledges that the state presented evidence that he was in the victim's apartment and witnessed the struggle between Taylor and the victim. Our review of the evidence reflects that it supported a finding that when the victim and Taylor fled from the victim's residence immediately after the shooting, the defendant was in possession of some of the property stolen from the victim's residence. The bus surveillance video introduced into evidence supported a finding that the defendant was carrying a backpack that contained a shoe box and cash that was taken from the victim's residence. The evidence also supported a finding that, in the immediate aftermath of the deadly events that transpired at the victim's residence, the defendant not only remained with Taylor, but casually discussed those events with him.

Specifically, the state presented the bus surveillance video that depicted the defendant and Taylor as they travelled to Hartford. The state also presented the testi-

mony of Kemorine Parker, who testified that, on the afternoon of June 30, 2009, she was waiting for a bus when she observed two black males, in their early twenties, running to catch the bus. Parker did not identify either individual. She stated that one of the males was carrying a book bag. Parker sat all the way in the back of the bus, and the two males sat opposite her. She testified that she overheard one of the males state: "I can't believe you got bit . . . by a dog." She stated that she overheard his companion state: "[I]t was a big dog."[6] Insofar as there was evidence that Taylor was bitten by the victim during the struggle that took place in the victim's residence and testimony from a state medical examiner that the victim was a large man, standing six feet tall and weighing 282 pounds, the jury reasonably could have found that the reference to "a big dog" referred to the victim.

"It is axiomatic that a jury may infer intent from behavior. As our Supreme Court has stated, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Raynor*, 84 Conn. App. 749, 760, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004). The jury reasonably could have found that the evidence did not suggest that the defendant had been surprised by, had regretted, or had attempted to stop the deadly events that he witnessed in the victim's residence. Rather, in addition to the evidence that he was present for and witnessed the events at issue, the evidence of his fleeing the scene with Taylor, his presence and demeanor with Taylor on the bus, the nature and tone of his conversation with Taylor,[7] and his possession of the victim's property supported an inference that he was not a mere bystander to the events at issue, but that he shared a criminal interest in the crimes with their perpetrator, Taylor. Thus, the state demonstrated beyond a reasonable doubt that he intentionally aided Taylor in the commission of the crime of burglary. "While we acknowledge that it appears that the defendant's conviction is premised, in large measure, on circumstantial evidence, we note that there is no legal distinction between direct and circumstantial evidence as far as probative force is concerned, and that it is not one fact, but the cumulative impact of a multitude of facts that establish guilt in a case involving substantial circumstantial evidence." *State* v. *Malone*, 40 Conn. App. 470, 481, 671 A.2d 1321, cert. denied, 237 Conn. 904, 674 A.2d 1332 (1996).

C

Next, the defendant argues that the state failed to prove beyond a reasonable doubt that he committed felony murder. Section 53a-54c, which defines felony

murder, provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery [or] burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

The defendant argues that the state failed to sustain its burden of proof because the evidence did not support a finding that he committed robbery or burglary. In light of our resolution of the defendant's sufficiency of the evidence claims in parts I A and B of this opinion, this claim fails.

II

Next, the defendant claims that the court violated his right to present a defense when it precluded him from presenting his version of the facts related to certain injuries sustained by Taylor, the other person involved in the crimes. We agree.

The following additional facts underlie this claim. In October, 2012, the defendant filed a motion in limine to preclude the state from introducing statements related to the present case that were made by Taylor to the police. The motion in limine provided in relevant part: "In this case, [the defendant] and Taylor were charged with almost identical crimes. After confessing to the police on July 16, 2012, Taylor was arrested for felony murder, murder, conspiracy to commit murder, robbery in the first degree and burglary in the first degree. . . . On February 27, 2012, Taylor pled guilty to felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree under the *Alford* doctrine.[8] On May 4, 2012, Taylor was sentenced to thirty-two . . . years in prison. . . .

"On July 16, 2009, Taylor gave a written confession after speaking with police about his version of the facts and circumstances of the June 30, 2009 incident. After providing police with the . . . written confession, Taylor was immediately arrested and incarcerated on a $2.5 million dollar bond. On July 20, 2009, four . . . days after his arrest, from prison, Taylor recanted his first confession but refused to sign a written statement. The

next day police returned to meet with Taylor wherein he participated in a photo identification of [the defendant]. Undersigned counsel is led to believe that Taylor may be unavailable to testify at trial and is refusing to cooperate with the state. . . .

"If the state offered the statements of Taylor into evidence, it would clearly be an attempt to prove the truth of the matter asserted in the state's case against [the defendant] in that the statements allege that the defendant was present for and participated in the crime which occurred inside of the decedent's apartment.

"Further, and more importantly, upon information and belief, Taylor will not be available for cross-examination relative for the aforementioned statements. . . .

"In Taylor's written confession he admits to shooting the decedent and indicates that he does not know what the other person was doing in the apartment while he was struggling with the decedent. In this statement, Taylor implicates the involvement of [the defendant] by acknowledging that another person was with him inside of the apartment as this crime took place. Further, it indicates that the 'other kid' had a shoe box in his backpack." (Citations omitted.) As he did during oral argument on the motion, the defendant argued in the motion and accompanying memorandum of law that any of the statements that Taylor provided to the police should be excluded under *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), as the testimonial hearsay of an unavailable witness.[9]

In his memorandum of law in support of his motion in limine, the defendant went on to state in relevant part: "On July 16, 2009 . . . Taylor told Detectives [Donald] Olson and [Jeffrey] Cutler that [the victim] bit him during a struggle in [the victim's East Hartford] apartment . . . . At the time, he was in the police department's interview room confessing to the murder of [the victim] in the presence of the two detectives. He signed a confession on that date accepting responsibility for the homicide while stating [that] he did not know what the other male was doing in the apartment at the time of the killing. In the signed confession he stated, '. . . during the struggle with [the victim], I got a small cut on my left hand and [the victim] bit my right wrist.' He further informed police on July 16, 2009, that he did not know the name of the other person that he was with in the apartment. In his confession, he stated that [the victim] unexpectedly drew a gun on him and the other person in the apartment, leading to a struggle involving Taylor and [the victim] and the eventual shooting by Taylor. . . . Four days later he contacted the police . . . blaming [the defendant] for the shooting and taking the position that he . . . was unaware that any homicide was going to take place."

On December 6, 2012, the court heard oral argument

on the motion in limine. After the defendant's attorney described the facts, generally as set forth in his motion and memorandum of law in support thereof, he argued that if Taylor did not testify, the court should exclude his statements from the evidence. The prosecutor responded that the state did not intend to offer *all* evidence of Taylor's statements to the police, characterizing them generally as "statements against penal interest" that may be barred under *Crawford*. The prosecutor, however, stated that he intended to offer evidence that Taylor told the police that he had a bite marks and scratches on his hands, including a bite mark inflicted by the victim. The prosecutor characterized this portion of Taylor's statements to the police as being nontestimonial in nature. The defendant's attorney argued that the evidence was unduly prejudicial and, because Taylor would not be available for cross-examination, its admission would violate the defendant's right to confront an adverse witness. It appears that the court deferred ruling on the issue until the time of trial.

Following additional oral argument related to the issue on January 7, 2013, the court ruled that, with regard to Taylor's statements to the police, it would permit the state to present evidence of Taylor's statement to the police that he had sustained a bite wound. The state argued that the statement was relevant to one or more issues in the case in light of the evidence of the "big dog" comments made by the defendant and Taylor on the bus, shortly after the shooting.

On January 8, 2013, outside of the jury's presence, the state called Taylor to the witness stand. Despite being ordered to do so by the court, Taylor refused to answer any questions posed to him concerning the events underlying the trial. The court held Taylor in contempt and sentenced him to six months incarceration.

On January 9, 2013, the court revisited its ruling to admit evidence of Taylor's statement that he had sustained a bite wound. At this juncture, the court disallowed the statement related to the bite wound. The court stated: "[R]ight now, based on what the evidence is, because the defense hasn't challenged anything concerning that statement, I'm going to disallow the statement concerning the bite. I understand that it is a statement against penal interest; the entire confession was a statement against penal interest. But if there's even a hint anywhere that that bite was anything other than where it came from, that statement does come in, and that includes during closing argument as well. I will reopen this case if there's a hint during closing argument that the bite was anything other than what it is. So, remember, I'll stop the trial and allow [Taylor's statement] in at that point." The court stated that it would permit Olson to testify that he had interviewed Taylor and that during the course of his interview he

photographed Taylor's injuries. The court also stated that the state could present such photographs in evidence. Later, in response to an inquiry by the defendant's attorney concerning the court's ruling, the court stated that it wanted to make it "very clear that if there's even a hint that that bite mark came from anywhere else, [then evidence of Taylor's statement] comes in." The defendant's attorney replied, "Right. And I made a note of that, opening the door."

Later, Olson testified that he interviewed Taylor on July 16, 2009, observed injuries on Taylor's hands, and photographed the injuries. The photographs were admitted into evidence. During his testimony, Olson testified: "He appeared to have a bite mark on his wrist and some lacerations on his other hand." The defendant objected to Olson's testimony. The court, noting that the testimony was Olson's observation of the injury, overruled the defendant's objection.[10] During subsequent examination by the state, however, Olson testified that *he learned from talking to Taylor* that the injury on his wrist was "[a] bite." The court sustained the defendant's objection to this inquiry and denied the defendant's motion for a mistrial related to it.[11] The court, however, provided the jury with a curative instruction directing it to disregard any testimony from Olson concerning what Taylor may have stated to him about the injury. The court instructed the jury that the nature of any marks on Taylor's hands was a factual matter for the jury to decide.

In addition to Olson's testimony and the photographs depicting Taylor's injuries, the state presented evidence that was relevant to the issue of Taylor's injuries from Dennis Minott, the operator of the bus on which the defendant and Taylor were passengers on June 30, 2009. Minott testified that one of the two black males who got on his bus at Main Street and Brewer Street asked him for "a tissue," but that he was unable to provide him with it.[12] As we have discussed previously in this opinion, the jury also heard evidence related to a bite injury from Parker, who described the conversation that she overheard on the bus.

For the first time, on appeal, the defendant claims that after the court properly excluded evidence concerning Taylor's statements to the police, it improperly restricted his right to challenge the evidence related to Taylor's wounds that it had permitted the state to introduce at trial. The defendant argues: "The state introduced evidence that the nature of Taylor's wrist injury was the result of a bite. Parker's dog bite testimony and Minott's tissue testimony corroborated Olson's bite mark testimony. Evidence of the source, nature, and timing of Taylor's injuries was relevant to refute the testimony of Olson, Parker, and Minott. . . . When the trial court precluded [the] defendant from presenting evidence regarding the nature, source, and

timing of the alleged bite mark, the court precluded [the] defendant from challenging Olson's testimony. Olson's testimony provided the basis for Parker's and Minott's testimony, and because of the importance of Parker's testimony to the state's case, the state cannot prove beyond a reasonable doubt that Olson's testimony may not have had a tendency to influence the judgment of the jury."

The state argues before this court that the defendant is unable to demonstrate the existence of a constitutional violation because the court did not bar the defense from introducing any evidence. The state goes on to argue: "On its face, the trial court's comment did not bar the defendant from offering evidence of an alternative source for Taylor's injuries. Indeed, the [court's] comment invited such proof, but simply indicated that, if the question of the origin of the wounds was placed in contest, the state would be permitted to present a counterproof. There was no order barring the defendant from presenting evidence in his defense, and, thus, there was no error."

The defendant frames this newly raised claim in constitutional terms, as a violation of his right to present a defense as guaranteed by the sixth amendment to the federal constitution. He seeks review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) Id.; see *In re Yasiel R.*, 317 Conn. 773, 781,     A.3d     (2015) (modifying *Golding*'s third prong).

We will review the claim under *Golding* because the record is adequate to do so and the claim is of constitutional magnitude. Here, the record reflects that the court, having determined that Taylor's statements to the police should be excluded under *Crawford*, indicated that if the defendant *in any manner* attempted to challenge the evidence that the state had presented that Taylor's injury was the result of "a bite," it would permit the state to introduce evidence of Taylor's statement concerning his injury. The court conditioned its exclusion of testimonial hearsay under *Crawford*, as it related to Taylor's statements to the police concerning his injuries, on the defense not addressing the state's evidence, and particularly Olson's testimony, concern-

ing the origin of such injuries. Although the state argues that the defendant has misinterpreted the court's ruling, we are not persuaded by its characterization of the court's ruling. The court unmistakably conveyed in its ruling that any attempt by the defense to contest the state's evidence that the injuries were the result of "a bite" would open the door for the state to present evidence that the court had deemed inadmissible under *Crawford*.

The court did not explicitly base this ruling on one or more rules of evidence. The ruling concerned the presentation of evidence that the court determined to fall within the ambit of *Crawford*, the defendant's ability to present evidence to counter certain evidence presented by the state, and the defendant's ability to make arguments to the jury that challenged the state's evidence and its theory of the case.

"There is no dispute that in the adversarial setting of a trial, the accused has a right under the confrontation clause to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, [can] appropriately draw inferences relating to the reliability of the [State's] witness. . . . It is also undisputed that the accused has an equal right under the compulsory process and due process clauses to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . We also are mindful that [t]he primary interest secured by confrontation is the right to cross-examination . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Marcelino S.*, 118 Conn. App. 589, 599–600, 984 A.2d 1148 (2009), cert. denied, 295 Conn. 904, 988 A.2d 879 (2010).

"The defendant's right to present a defense under the sixth amendment to the United States constitution does not compel the admission of any and all evidence offered in support thereof. . . . The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 13, 6 A.3d 790 (2010). "The defendant's right to present his own witnesses to establish a defense . . . is a fundamental element of due process of law." (Internal quotation marks omitted.) *State* v. *Reeves*, 118 Conn. App. 698, 708, 985 A.2d 1068 (2010). "The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, *the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies*." (Emphasis added; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002). "Our Supreme Court has stated that the defendant's constitutional right to

present a defense does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Eagles*, 74 Conn. App. 332, 335, 812 A.2d 124 (2002), cert. denied, 262 Conn. 953, 818 A.2d 781 (2003).

The right to present a defense also encompasses the right to present proper argument to the trier of fact. Although the defendant's claim is limited to the rights afforded him under our federal constitution, we observe that "[b]oth the Connecticut and the United States constitutions protect a defendant's right to voice closing arguments before the trier of fact. The sixth amendment guarantee in the federal constitution of the right to assistance of counsel has been held to include the right to present closing arguments. *Herring* v. *New York*, 422 U.S. 853, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Also, article first, § 8, of the Connecticut constitution, which provides that 'the accused shall have a right to be heard by himself and by counsel,' has been held to guarantee a right to present a closing argument. . . . The defendant enjoys the same right whether the trial is to a jury or to the bench." (Citation omitted.) *State* v. *Plaskonka*, 22 Conn. App. 207, 210–11, 577 A.2d 729, cert. denied, 216 Conn. 812, 580 A.2d 65 (1990).

Having determined that the claim implicates the defendant's right to present a defense, we conclude that the defendant has demonstrated that a constitutional violation exists and deprived him of a fair trial. Rather than considering the admissibility of Taylor's statements to the police and the defendant's ability to challenge other evidence presented by the state related to Taylor's injuries as distinct matters, the court issued a ruling that joined the two matters and, in so doing, issued a ruling that effectively precluded the defendant from making any effort to undermine the state's evidence that Taylor's injuries resulted from a bite. The court improperly left the defense in the untenable position of having to choose between a violation of the defendant's right to confrontation and a violation of the defendant's right to present a defense. The state has not presented this court with any authority that would permit a court to condition a defendant's right of confrontation on the defendant's not exercising his right to challenge the state's evidence.

The court's ruling, occurring in the middle of the trial, did not merely infringe upon the defendant's ability to present evidence, but broadly precluded the defense from even "hinting" during closing argument that the injury was "anything other" than a bite. The court's

ruling was very significant to the defense because the evidence related to Taylor's injuries, and the state's arguments concerning the *origin* of those injuries, was a key component of the state's case, which was based on circumstantial evidence. After the state presented evidence from Olson, Parker, and Minott that supported a finding that Taylor had sustained a bite injury, the prosecutor suggested in argument that Taylor had been bitten by the victim. By arguing, as it did, that, shortly after the events at issue, the defendant and Taylor referred on the bus to a "big dog" that had bitten Taylor, the state was able to present a compelling argument that supported a finding that the defendant was present with Taylor in the victim's apartment and guilty of the crimes with which he was charged. In light of all of the circumstances, we conclude that the defendant was deprived of a fair trial.

As we stated previously in this opinion, the state's analysis of this claim is limited to arguing that the court's ruling did not limit the defendant's ability to present any evidence in his defense. We observe that the state does not attempt to demonstrate that the constitutional violation is subject to harmless error analysis or that the constitutional violation is harmless beyond a reasonable doubt.[13]

In light of the constitutional violation, we conclude that the proper remedy is to reverse the defendant's conviction and to remand the case to the trial court for a new trial.

III

Next, the defendant claims that the court made several errors in the admission of evidence. We agree in part with the defendant's claim.

Although, in part II of this opinion, we have concluded that the defendant is entitled to a new trial, we will address the evidentiary claims raised by the defendant to the extent that we are persuaded that the issues involved therein, involving the admissibility of evidence, are likely to arise during proceedings on remand. "As a general matter, when our appellate courts reverse the judgment and remand the case for a new trial, only claims likely to arise on retrial are addressed by the reviewing court." *State* v. *Perez*, 147 Conn. App. 53, 58 n.4, 80 A.3d 103 (2013), cert. granted on other grounds, 311 Conn. 920, 86 A.3d 468 (2014). Typically, in considering claims of evidentiary error, this court evaluates whether an error occurred and, if so, whether it constitutes reversible error in that affected the verdict. In light of our resolution of the claim raised in part II of this opinion, in which we have concluded that the defendant is entitled to a reversal of the judgment of conviction and a new trial, it is unnecessary that, in relation to the evidentiary errors discussed herein, we undertake an analysis of whether such errors were

harmful to the defendant.

Before turning to each aspect of the present claim, we first set forth some general principles that guide our review. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling[s] [on these bases] . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76 (2010).

A

First, the defendant claims that the court improperly permitted the state to present testimony from a witness, Nicole Clark, who identified the defendant as one of the persons depicted in the video images taken from the bus. We disagree.

The following additional facts are relevant to this claim. The defendant filed a motion in limine in which he asked the court to preclude the state from presenting any evidence related to the manner by which the police initially identified him as a suspect in the crimes. Specifically, the defendant sought to preclude evidence that the police had identified him as a suspect on the basis of "an anonymous phone call" to the police from a person who had viewed images that had been taken from the video footage that was generated by cameras on the bus, and had identified the defendant from those images. The defendant argued that any testimony opining that he was one of the persons on the bus was inadmissible under § 7-3 of the Connecticut Code of Evidence because the identity of the persons in the surveillance images was an ultimate issue of fact for the jury.

When the court heard argument on the motion, the state represented that the police had not received an *anonymous* telephone call identifying the defendant, but had received a telephone call from Clark, who had viewed the images taken from the bus and had knowledge of the defendant because she had worked with him previously. The state indicated that it intended to present testimony from Clark that the person depicted in the images, which the police had distributed to the public in an attempt to generate investigative leads, was the defendant.[14] The defendant's attorney argued that the observations made by Clark were irrelevant to the

defendant's guilt, but pertained only to the police investigation in this case. The defendant's attorney also argued that Clark's testimony would encompass an ultimate issue before the jury, namely, whether the defendant was present on the bus. In response to an inquiry by the court, the defendant's attorney stated that the issue of whether the defendant was present on the bus was in dispute. The defendant's attorney also indicated that the defense intended to challenge the sufficiency of the police investigation in this case. The court stated that the issue of identification was relevant to the issues before the jury and that, on the basis of the state's proffer, the evidence was admissible.

Thereafter, Clark testified that, prior to the events at issue in this case, she became familiar with the defendant while working with him at a vacuum company. She identified the defendant, who was present in the courtroom. Clark testified that she observed "a picture" of the defendant that had been distributed to the public by the East Hartford Police Department and subsequently provided information to the police that she recognized the man in the picture as the defendant. Clark was shown a photograph that previously had been introduced into evidence, and she testified that the exhibit was the same picture from which she had identified the defendant. Absent objection, the state presented an audio recording of the telephone call that Clark made to the police.

The defendant's claim is based on § 7-3 of the Connecticut Code of Evidence, which provides in relevant part: "(a) Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue. . . ." "[T]he phrase ultimate issue is not amenable to easy definition. . . . As a rule, however, [t]estimony is objectionable if it embraces an opinion on the ultimate issue to be decided by the trier of fact. . . . It is improper for a witness to offer testimony that essentially constitutes a legal opinion about the guilt of the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Finan*, 275 Conn. 60, 66, 881 A.2d 187 (2005). An ultimate issue is "one that cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]." (Internal quotation marks omitted.) Id.

The state argues, and we agree, that Clark's testimony that she recognized the defendant as the person depicted in the photograph that had been disseminated by the police is not characterized accurately as *opinion* testimony as to whether the photograph depicted the defendant. Clark recognized the defendant's face as it appeared in the still image based upon the fact of her past acquaintance with him; she did not merely offer

an opinion as to whether the still image depicted the defendant. Thus, her testimony was based on the *fact* that she recognized the defendant, not on an opinion that the photograph depicted him. The significance of this distinction has been recognized in prior decisions; see, e.g., *State* v. *Felder*, 99 Conn. App. 18, 25 n.6, 912 A.2d 1054, cert. denied, 281 Conn. 921, 918 A.2d 273 (2007), and distinguishes the testimony in the present case from the police testimony at issue in *State* v. *Finan*, supra, 275 Conn. 62–71, on which the defendant relies.

Additionally, we disagree with the defendant's characterization that the testimony embraced an ultimate issue before the jury. Clark's testimony that she recognized the defendant as depicted in the photograph at issue was not tantamount to a legal opinion about his criminal culpability. The state's case rested on circumstantial evidence and his presence with Taylor, on the bus, shortly after the victim's murder certainly was integral to the state's theory of the case and to the issue of whether the defendant was criminally liable for the several offenses at issue in the case. The defendant's presence on the bus, however, did not directly shed light on his conduct at the victim's residence, whether the defendant had the criminal intent related to the offenses with which he was charged, or whether he had entered into a conspiracy with Taylor. Thus, we do not conclude that his presence on the bus was the essence of the matters to be decided by the jury. See, e.g., *State* v. *Grant*, 286 Conn. 499, 547, 944 A.2d 947 (concluding that prosecutor's remarks in comparing similarities between drawings of police sketch artist and photograph of defendant did not constitute opinion as to ultimate issue), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *State* v. *DeJesus*, 128 Conn. App. 129, 146, 17 A.3d 107 (concluding that testimony as to whether defendant was part of group did not constitute opinion as to ultimate issue), cert. denied, 301 Conn. 923, 22 A.3d 1275 (2011); *State* v. *Luther*, 114 Conn. App. 799, 806–807, 971 A.2d 781 (concluding that prosecutor's remarks about source of police complaint did not pertain to ultimate issue before jury), cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009). Likewise, we are not persuaded by the defendant's reliance on *State* v. *Finan*, supra, 275 Conn. 62–71, in which our Supreme Court concluded that opinion testimony from several police officers that they suspected that the defendant was one of the unidentified persons depicted in a surveillance video that showed individuals robbing a convenience store was based on his mannerisms, his distinctive walk, and the profile of his partially obscured face was an improper opinion on an ultimate issue in the case. Unlike the identification issue in the present case, the identification at issue in *Finan* could not be separated from the ultimate issue of the defendant's criminal liability related to the robbery. Id., 67.

For the foregoing reasons, we conclude that the

court's admission of Clark's testimony did not reflect an abuse of its discretion.[15]

B

Next, the defendant claims that the court improperly permitted Olson to testify that Taylor had or appeared to have a bite mark on his wrist because Olson's characterization of the injury as a bite mark constituted impermissible lay opinion concerning Taylor's injuries.[16] In part II of this opinion, we discussed the facts surrounding Olson's testimony that, when he interviewed Taylor on July 16, 2009, Taylor "had a bite on his wrist . . . ." In response to this answer, the defendant's attorney stated: "Objection, Your Honor." Although the defendant did not set forth on the record a basis for the objection, the court overruled it, stating that the testimony reflected Olson's observations of the injury, and that the defendant would have an opportunity to cross-examine Olson about those observations. Immediately thereafter, Olson testified: "He appeared to have a bite mark on his wrist and some lacerations on his other hand." The state also presented into evidence photographs of the injuries at issue.

In terms of reviewability, we observe that the defendant did not clearly state the grounds of his objection before the trial court. In responding to the objection, the court stated that Olson was testifying from his observations and that the defense could cross-examine him about his observations. On this basis, we conclude that the court understood the defendant's objection to be based on whether Olson's testimony properly was limited to his observations or whether it was impermissible opinion testimony. Accordingly, we will address the defendant's claim related thereto.

Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." "As a general rule, a lay witness may not give opinion testimony and may testify only as to observed facts." *State* v. *Watson*, 50 Conn. App. 591, 600, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001). "A lay witness may be able to testify about a medical condition common in everyday life, or about the witness's own condition." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 7.2.1 (c), p. 447.

Here, Olson was not testifying as an expert witness with any type of training or experience related to the recognition of bite marks. Cf. *State* v. *Ingram*, 132 Conn. App. 385, 401–402, 31 A.3d 835 (2011) (testimony that

wounds appeared to be result of dog bite permissible because it came from witnesses with training and experience related to matters about which they testified), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012). The prosecutor asked Olson about "the nature of the injuries" to Taylor that he had observed on July 16, 2009. The prosecutor showed Olson photographs of the injuries at issue, marked as full exhibits, which Olson testified were fair and accurate representations of the injuries he observed on July 16, 2009. The prosecutor's inquiry permitted Olson to describe his observations of Taylor's injuries on that date. By replying, however, that Taylor appeared to have "a bite mark on his wrist," Olson did not merely describe what he had observed in terms of the physical appearance of the skin on Taylor's wrist. Instead, by describing the injury as "a bite mark," he unquestionably expressed his opinion that Taylor had been bitten without establishing the necessary expertise or qualifications.

The state urges us to conclude that the admission of the testimony was proper because it would have been readily apparent to anyone that the injury was a bite mark. Even if we agreed with the state's characterization of Taylor's injury as depicted in the photographs, which we do not, we disagree for the reasons stated previously that it is proper for a lay witness to describe observed injuries in such a manner that suggests the origin of them. Although, in conjunction with other evidence, the state rationally could have invited the jury to infer that the injuries originated from a bite, we conclude that it was improper for the court to have permitted Olson to have rendered such an opinion.[17]

In light of the foregoing, we conclude that this improper opinion testimony should have been stricken from the jury's consideration.

C

Next, the defendant claims that the court improperly permitted the state to present testimony from Parker concerning the conversation that she overheard on the bus on June 30, 2009. The defendant argues that the testimony was not relevant. We disagree.

The following additional facts are relevant to this claim. The defendant filed a motion in limine in which he asked the court to preclude, as inadmissible hearsay, evidence of any statements that the defendant and Taylor made on a bus on June 30, 2009. The defendant explained in the motion that he anticipated Parker to testify about two males on the bus and their conversation referring to one of the males having been bitten by "a big dog." The defendant's motion stated that the defense expected the state to present testimony from Parker that she overheard one individual state, "I can't believe I got bit by a dog," and another individual reply, "that was a big dog."

On December 6, 2012, the court heard oral argument on the motion. The prosecutor argued that the statements were not hearsay because they were not being offered for the truth of the matter asserted therein, specifically, that either of the two individuals involved had been bitten by a big dog. Rather, the prosecutor explained, the state intended to offer the statements to demonstrate (1) that one of the individuals had been bitten by the victim and (2) that the two individuals on the bus were together. The prosecutor argued that the statement attributable to the defendant was that of a party opponent and that the statement attributable to Taylor helped to put the defendant's statement in context and was admissible to demonstrate its effect on the hearer, the defendant. The defendant's attorney argued that the state had failed to lay a proper foundation to support any of its theories of admissibility.

The court admitted the statement, noting that the state intended to present not only evidence of the statements made on the bus, but of Taylor's statement to the police that the victim had bitten him during a struggle in his residence, the video footage from the bus, and photographic evidence of Taylor's injuries. The court stated that all of this evidence was relevant to demonstrate that a conspiracy existed, that Taylor and the defendant were acting "together . . . ."

At trial, Parker testified in relevant part that, on the afternoon of June 30, 2009, she was waiting for a bus when she observed two black males, in their early twenties, running to catch the bus. She stated that one of the males was carrying a book bag. Parker sat all the way in the back of the bus, and the two males sat opposite her. She testified that she overheard one of the males state: "I can't believe you got bit by the dog—I can't believe I got bit by the dog—by a dog." The other individual replied: "[T]hat was a big dog, it was a big dog." During Parker's testimony, the defendant's attorney objected to the testimony concerning any statements made on the bus on the ground that the statements were not admissible under "the Code of Evidence," they were inadmissible hearsay, and the statements were not against penal interest. The defendant's attorney also stated that, because, prior to Parker's testimony, the court had stricken Olson's testimony that Taylor told the police that he was bitten by the victim, Parker's testimony was irrelevant. The court overruled the objection, stating that Parker's testimony was relevant and that the statements at issue were not hearsay because they were not being introduced for the truth of the matters asserted therein. The court admitted the evidence without any limitation as to its use.[18]

On appeal, the defendant's claim is limited to the relevancy objection that he raised before the trial court; he states that "[t]he trial court correctly concluded that

the statements were not hearsay."

"[R]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 275–76, 96 A.3d 1199 (2014); see also Conn. Code Evid. § 4-1.

On the basis of inferences drawn from other evidence, the prosecutor suggested in argument that the speaker on the bus who stated, "I can't believe you got bit . . . by a dog," was the defendant. The prosecutor suggested that the speaker on the bus who replied, "[I]t was a big dog," was Taylor.

Here, the evidence of both statements, regardless of their truth or falsity, was evidence that the defendant and Taylor were together on the bus. The defendant argues that "although the teens' statements put the two together, the statements do so in a way that [does] nothing to assist the jury in determining the defendant's guilt or innocence." Yet, the testimony made the fact that the defendant and Taylor were together on the bus more probable than it would have been without it. The fact that the defendant and Taylor were together on the bus, conversing, was significant because the state presented evidence to support a finding that their conversation occurred shortly after the victim was murdered. This was significant because the state presented evidence to support a finding that Taylor had been present in the victim's residence and that he had possessed the murder weapon on the day of the victim's murder, later selling it to another individual shortly thereafter. The state attempted to demonstrate that the defendant had conspired with Taylor and that he had solicited, requested, commanded, importuned or intentionally aided Taylor to engage in criminal conduct involving the victim. When viewed in light of other evidence, the evidence of the defendant's conversation with Taylor on the bus was highly material in demonstrating the defendant's intimate involvement with Taylor in the criminal events that had taken place moments prior to the conversation. Accordingly, we reject the defendant's claim that the evidence was irrelevant.

D

Next, the defendant claims that the court improperly permitted the state to present testimony from Minott that one of the two males who had boarded the bus

asked him for a tissue.[19] We reject the defendant's claim.

The following additional facts are relevant to this claim. The state presented testimony from Minott, the operator of a city bus on June 30, 2009. Minott testified in relevant part that, on that day, two young, black males boarded his bus near the intersection of Main Street and Brewer Street in East Hartford. He testified that one of the males asked him for something. When the prosecutor asked Minott, "What did he ask you for?" the defendant's attorney stated, "Objection, Your Honor." Before the court responded to the objection, however, Minott stated, "A tissue." The defendant's attorney once again stated, "Objection, Your Honor." The court asked the defendant's attorney to state the basis for his objection, to which he replied, "Hearsay." The court asked the prosecutor to rephrase the question. The foregoing exchange occurred in the jury's presence.

The prosecutor asked Minott, "Did one of the individuals ask you for anything?" Minott replied, "Yes." When the prosecutor asked, "What did he ask you for?" the defendant's attorney again objected. Then, the prosecutor asked, "Based upon what he asked you for, were you able to provide anything to the individual?" The defendant's attorney objected that the inquiry was not relevant. The court replied that the question did not call for a hearsay response and that the inquiry was relevant. Ultimately, the prosecutor asked, "Were you able to provide anything to that individual?" Minott replied, "No, sir." During his direct examination, Minott did not thereafter refer to a request for a tissue.

During cross-examination, the defendant's attorney asked Minott: "[S]o, as I understand it, one of the individuals came up to you and asked you for a tissue. Is that right?" Minott stated, "Correct." The defendant's attorney asked, "You didn't have a tissue. Is that correct?" Minott agreed that he did not have a tissue. The defendant's attorney asked him if he "[saw] anything that required the use of a tissue," and Minott replied in the negative.

The defendant apparently argues that the court improperly admitted Minott's statement concerning a tissue, which he considers to be inadmissible hearsay. The state, apparently sharing the view that Minott's statement was part of the evidence, argues that the defendant's claim is not reviewable because the defendant "did not interpose a timely objection to forestall Minott's response and, following the court's favorable ruling on the objection, move to strike Minott's answer."

Initially, we observe that the only relevant ruling occurred when the court effectively sustained the defendant's initial objection by instructing the prosecutor to rephrase his inquiry. This ruling was in the defendant's favor.

Thus, the record reflects that once the prosecutor asked a question that called for Minott to reveal what was requested by one of the individuals on the bus, the defendant's attorney stated that he objected to the question. "The generally accepted rule as to when [an] objection to a question must be interposed has been stated to be: For evidence contained in a specific question, the objection must ordinarily be made as soon as the question is stated, and before the answer is given; unless the inadmissibility was due, not to the subject of the question, but to some feature of the answer. . . . This rule, however, is to be reasonably applied. . . . The object is to prevent a party from knowingly withholding his objection, until he discovers the effect of the testimony, and then if it turns out to be unfavorable to interpose his objection." (Citation omitted; internal quotation marks omitted.) *State* v. *Reeves*, supra, 118 Conn. App. 704. "It is usually the case that when a question posed to a witness at trial is not itself improper but the answer to that question contains inadmissible material, an objection made upon the answer is seasonable . . . . The proper form of such an objection is a motion to strike the answer." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 75 Conn. App. 364, 374, 815 A.2d 1261 (2003), rev'd on other grounds, 272 Conn. 515, 864 A.2d 847 (2005).

Upon hearing the prosecutor's question, the defendant's attorney objected to it. Therefore, we disagree with the state that the objection was in any way untimely. Moreover, we disagree with the state that it was the burden of the defendant's attorney to forestall Minott from answering the question posed to him after he announced that he objected to it.[20] To protect the defendant's right to challenge the admissibility of the state's evidence and to ensure the orderly progress of the trial, it was the function of the trial judge, not the defendant's attorney, to instruct the witness not to answer the question when an objection was pending. It has been recognized that "[t]he function of the court in a criminal trial is to conduct a fair and impartial proceeding. . . . A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. . . . Control of the proceedings in the courtroom is necessarily within the trial judge's discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Jupin*, 26 Conn. App. 331, 348–49, 602 A.2d 12, cert. denied, 221 Conn. 914, 603 A.2d 404 (1992). Thus, the better practice would have been for the court to have instructed the witness to refrain from answering. Once the court effectively sustained the objection by instructing the prosecutor to rephrase the question at issue, it also would have been the better practice for the court to have stricken Minott's response that the individual on the bus had asked for a tissue.

The defendant, having obtained a favorable ruling with regard to his objection, did not move to strike Minott's response concerning a tissue. Cf. *State* v. *Bausman*, 162 Conn. 308, 313, 294 A.2d 312 (1972) (reviewing court rejects claim that trial court should have stricken testimony previously ruled inadmissible). In an instructive case that considered a witness' partial answer to a question, made before an objection had been made by counsel, our Supreme Court ruled that counsel was not required to move to strike the partial answer after the court had sustained its objection: "There is authority that where the court in sustaining an objection to the question has not directed the jury not to consider the reply given, a motion to strike it out is essential to its proper elimination. . . . We adopt, however, a rule . . . which is less technical, yet sufficient for the ample protection of the parties' rights. If the question is put and the answer given in such rapid succession that the party objecting has not fair opportunity to state his objection, it is the duty of the court to entertain the objection when thereafter promptly made. . . . We are not here concerned with a situation presenting the question whether the jury might have failed to understand the effect of the ruling and so something more than the mere sustaining of the objection would be necessary in order to protect the rights of the parties. The only basis upon which the plaintiff can claim error in the ruling of the trial court in setting aside the verdict is that the jury could, in the absence of a motion to strike out, properly consider the testimony. That is not the law in this jurisdiction." (Citations omitted.) *Hackenson* v. *Waterbury*, 124 Conn. 679, 684, 2 A.2d 215 (1938); see also *State* v. *Lewis*, 303 Conn. 760, 779, 36 A.3d 670 (2012) (observing that, under *Hackenson*, once court sustains objection to inquiry in presence of jury, witness' response thereto may not be considered even in absence of motion to strike).[21]

The rationale of *Hackenson* leads us to conclude that Minott's statement concerning a tissue, made during his direct examination, was not part of the evidence in this case. This conclusion undermines the state's argument that it was the defendant's burden to preserve the claim of error by moving to strike Minott's response, and it also undermines the defendant's claim that the court had erroneously admitted that response. The defendant obtained a favorable ruling on his hearsay objection and, in answering the prosecutor's inquiries, Minott did not refer to the content of any out-of-court statements.

In any event, the defendant's claim suffers from the infirmity that, during cross-examination, the defense elicited the very testimony that the defendant now claims the court should have excluded. Although the prosecutor was unable to elicit testimony concerning a request for a tissue, the following colloquy between

the defendant's attorney and Minott occurred during cross-examination:

"Q. Mr. Minott, so as I understand it, one of the individuals came up to you and asked for a tissue. Is that right?

"A. Correct.

"Q. You didn't have a tissue. Is that correct?

"A. No, I didn't have—

"Q. Didn't see anything that required the use of a tissue. Correct?

"A. No, sir."

It is well settled that "[a] defendant cannot rely upon the admission of evidence which he himself introduced as a basis for a reversal of his conviction. *State* v. *Smith*, [supra, 212 Conn. 610]; *State* v. *Kinsey*, 173 Conn. 344, 349, 377 A.2d 1095 (1977); *State* v. *Vilhotti*, 11 Conn. App. 709, 713, 529 A.2d 235 (1987)." *State* v. *Anderson*, 20 Conn. App. 271, 279 n.3, 566 A.2d 436 (1989), cert. denied, 213 Conn. 813, 569 A.2d 549 (1990).

Accordingly, the defendant cannot successfully challenge the admission of evidence when he was responsible for placing that evidence before the jury.

E

Next, the defendant claims that the court improperly permitted the state to elicit testimony from Detective Jason Smola concerning what was in the backpack that the defendant carried onto the bus. We agree with the defendant that the court improperly admitted the testimony at issue.

The following additional facts are relevant to this claim. Prior to the start of the trial, the defendant filed a motion in limine in which he asked the court to "exclude as evidence in this case any reference by police officers, or other lay witnesses, as to the contents of the backpack, or the origin of the contents of the backpack, in the possession of the individuals as seen on a [Connecticut] Transit bus surveillance video. Any reference as to the contents of the backpack, or where the contents originated from, are speculative and made without personal knowledge." In support of his motion, the defendant relied on § 7-1 of the Connecticut Code of Evidence.

When the court heard argument on the defendant's motion, the defendant's attorney stated that in the surveillance images captured on the bus, an item is visible in the defendant's backpack. The defendant's attorney stated that, on the basis of Smola's testimony at a probable cause hearing, he believed that Smola would be unable to testify that he had personal knowledge of the item or whether it could be associated with any item that had been in the victim's apartment. The defendant

argued that Smola did not have any foundation upon which to render an opinion related to the item. Essentially, the prosecutor replied that the court should permit Smola, on the basis of his observations of the surveillance video in evidence, to testify as to what appeared to be in the backpack that was captured in the surveillance videos.

The court concluded that the inquiry was permissible. The court stated: "The witness is going to be able to testify as to what it looks like. This is not expert opinion. I can say that it looks like the marshal who's directly in front of me is wearing black socks. They might be navy blue or they might be brown for all I know at this point, but it looks like black socks. That's what it looks like." The defendant took exception to the court's ruling, noting that there was "the thinnest fibers of circumstantial evidence" to surmise that there was a shoe box in the defendant's backpack.

Later, during the trial, the court heard additional argument from the defendant, during which his attorney emphasized that determining what was in the backpack, as it is depicted in the bus video images that the state represented would be presented in evidence, was a question for the jury to decide, and that to permit Smola to interpret the images for the jury would invade the fact-finding province of the jury. The defendant's attorney stated that Smola was not in any better position than was the jury from which to make a determination as to what was inside the backpack. The court disagreed with the defendant's arguments, stating: "I will allow [Smola] to testify that it was a box, it was a gray box, it looked like—people are allowed to testify as to what things looks like, aren't they? It looked like someone ran a light, is that an opinion or is that a fact?"[22]

Smola testified concerning how he came to possess the bus surveillance video and, at the prosecutor's direction, Smola discussed the events depicted in the video that was submitted as an exhibit for the jury. As relevant to the claim, when the portion of the video that depicted the backpack was shown to the jury, the prosecutor asked Smola: "There appears to be a backpack up by the garbage can. Were you able to determine through your investigation what you believe is contained within that backpack?" After the court overruled a defense objection to the inquiry, Smola testified: "It's my belief through investigation it was a sneaker box."

During his cross-examination, Smola testified that he did not know whether the item in the backpack was a shoe box and that the police did not recover the backpack during their investigation. The defendant's attorney asked Smola to compare a shoe box that had been recovered from the victim's residence with the object that was visible inside the backpack. Smola's responses to this line of inquiry revealed that the shoe box in evidence appeared to be different in some respects than

the item depicted in the video. At one point during his cross-examination, the defendant's attorney asked Smola whether it was true that he could not testify that the item in the backpack came from the victim's residence. Smola testified that he could because "Donele Taylor said that." Referring to the evidence that the victim sold sneakers and kept an inventory of sneakers at his residence, the defendant's attorney asked Smola if he was aware of any physical evidence that linked the defendant to any shoe box that had been seized by the police. Smola testified that he was unaware of any such evidence.

On appeal, the defendant raises the argument that he raised at trial, which is that it was improper for Smola to opine that the item in the backpack was a shoe box. The defendant argues that the evidence reflects that Smola did not have any firsthand knowledge of the contents of the backpack and that his opinion about what was depicted in the backpack shown in the bus video invaded the fact-finding province of the jury. Also, the defendant argues that Smola's opinion in this regard was based on his knowledge of Taylor's statements to the police which, as we have discussed previously in this opinion, the court had deemed inadmissible under *Crawford*. Thus, the defendant raises the purely evidentiary argument that he raised at trial and, in the alternative, a newly raised claim that, inasmuch as Smola testified that he relied on Taylor's out-of-court statements to the police, his testimony was inadmissible under *Crawford*. With regard to the newly raised claim that Smola's testimony violated his right to confrontation, the defendant affirmatively requests review under *State* v. *Golding*, supra, 213 Conn. 239–40.

"[W]e must be mindful that [t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." (Internal quotation marks omitted.) *State* v. *Cortes*, 276 Conn. 241, 253, 885 A.2d 153 (2005). Because we agree with the defendant's claim that the admission of Smola's testimony with regard to the contents of the backpack was improper on purely evidentiary grounds, we need not consider his constitutional claim.

As we already have set forth in part III B of this opinion, § 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." The state did not present Smola as an expert witness with training or experience related to the interpretation of video evidence. It is apparent from a review of his testimony that he did not have any firsthand knowledge of the item in the backpack; he plainly testified that the police never recovered the backpack or

its contents. We are unaware of any authority under which a lay witness who lacks firsthand knowledge of matters in evidence may render his or her opinion as to such matters by presenting his interpretation of the evidence to the jury. The state argues that the testimony was proper because the evidence reflects that Smola had viewed the bus video and merely rendered a lay opinion that the item depicted therein was similar to a shoe box. Under the state's rationale, it would be proper for *any* witness who was capable of watching the video evidence to render his or her opinion with regard to what the video depicted.[23] We are unaware of any support in the law for such a broad proposition.

Accordingly, even were we to set aside Smola's apparent reliance on matters that the court deemed to be inadmissible, specifically, Taylor's statements to the police,[24] we conclude that it was improper for the court to have permitted Smola to offer a lay opinion with regard to the contents of the backpack depicted in the bus video.

F

Next, in a claim closely related to the claim we addressed in part III E of this opinion, the defendant claims that the court improperly permitted Smola to testify during his cross-examination that he had learned from Taylor that the item in the backpack came from the victim's residence. The defendant asserts that this portion of Smola's testimony was based on evidence that the court had determined to be inadmissible under *Crawford*, specifically, Taylor's statements to the police. The defendant argues that the court abused its discretion by concluding that the testimony at issue was admissible on the ground that, during his cross-examination of Smola, the defendant's attorney had opened the door to the subject and, thus, had invited Smola's response.

We decline to reach the merits of the present claim because we are not persuaded that the issue it presents is likely to arise during proceedings on remand. We already have concluded in part III E of this opinion that it was improper for the court to have permitted Smola to offer a lay opinion with regard to the contents of the backpack depicted in the bus video. Thus, it is not likely that the inquiry that gave rise to the present claim, related to Smola's opinion of the contents of the backpack, will occur in the future. Also, the present claim arises from a colloquy between the defendant's attorney and Smola that we consider to be highly unlikely to be repeated at a future trial. Specifically, during cross-examination, following an objection to Smola's testimony by the defendant's attorney, and at a time when no question was pending, Smola referred to what he had learned from Taylor about the contents of the backpack.

IV

Next, the defendant claims that the court improperly denied his motion for a mistrial on the ground that, during Olson's testimony, Olson testified that he had learned from talking with Taylor that his injury was "a bite." The court struck the portion of the testimony that was the subject of the motion and delivered a curative instruction to the jury. We have discussed some of the facts related to this claim in part II of this opinion. In light of our resolution of that claim and the fact that the defendant is entitled to a new trial, however, it is unnecessary for us to reach the merits of the present claim.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] The court imposed a total effective sentence of 105 years incarceration, with a mandatory minimum sentence of twenty-five years incarceration. We note that the defendant also was found guilty of conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (2), and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (2). Although the court sentenced the defendant on the conviction of those charges, it subsequently vacated the conviction of those charges and the sentences related to them.

[2] In his principal brief, the defendant raised a double jeopardy claim related to his conviction of three conspiracy offenses. We do not address this claim because, in his reply brief, the defendant expressly withdrew it.

[3] We address the defendant's sufficiency of the evidence claim before we address any other claims because if a defendant prevails on such a claim, the proper remedy is to direct a judgment of acquittal. See *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 564 (2007). We note that the defendant filed a postverdict motion for a judgment of acquittal that encompassed the present claim. The court denied the motion.

[4] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[5] Although the defendant does not argue that the evidence was insufficient to support a finding that he committed robbery in the first degree as an accessory to Taylor, our review of the evidence leads us to conclude that it reasonably supported such a finding. The state presented evidence that Taylor was in the victim's apartment and, in the course of a larceny, shot the victim. This evidence, including the evidence of the defendant's activities and conversation with Taylor immediately following the incident, permitted the jury to find that the defendant, acting with the mental state required to commit burglary in the first degree, had solicited, requested, commanded, importuned or intentionally aided Taylor, who engaged in conduct constituting robbery in the first degree.

[6] We will address the defendant's claim related to the admission of this evidence in part III C of this opinion.

[7] In conjunction with other evidence, the evidence that, immediately following the victim's murder, the defendant spoke with Taylor on the bus about his being bitten by "a big dog" gives rise to a reasonable inference that the defendant was aware of the victim's large physical stature, that he was aware of the violent physical struggle that involved Taylor and the victim in the victim's residence that resulted in Taylor having sustained a bite injury, that the defendant concealed the true subject of his statements to Taylor while he was on the public bus, and that, as the state aptly observes in its brief before this court, the defendant "struck a crassly jovial tone" concerning this deadly event.

[8] Under *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a criminal defendant who enters a guilty plea does not admit guilt but acknowledges that the state has sufficient evidence to convict him. *State* v. *Fairchild*, 155 Conn. App. 196, 199 n.2, 108 A.3d 1162, cert. denied,

316 Conn. 902, 111 A.3d 470 (2015).

[9] "Under *Crawford* v. *Washington*, supra, 541 U.S. 68, the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence." (Internal quotation marks omitted.) *State* v. *Anwar S.*, 141 Conn. App. 355, 360–61, 61 A.3d 1129, cert. denied, 308 Conn. 936, 66 A.3d 499 (2013). The circumstances surrounding Taylor's out-of-court statements, made to the police, do not appear to be in dispute.

[10] We will address the defendant's claim related to the admission of this evidence in part III B of this opinion.

[11] We will address the defendant's claim related to the court's denial of his motion for a mistrial in part IV of this opinion.

[12] We will address the defendant's claim related to the admission of this evidence in part III D of this opinion.

[13] To the extent that the defendant asserts that the court precluded him from presenting "[e]vidence of the source, nature, and timing of Taylor's injuries," we recognize that the defendant did not make an offer of proof concerning what evidence he would have presented to the jury to counter the state's evidence concerning Taylor's injuries. The state does not argue that the lack of an offer of proof should thwart review of the present claim. If the court's ruling was evidentiary, rather than constitutional, in nature, such a failure likely would be fatal to review of the defendant's claim. This court has observed: "Although an offer of proof may not always be necessary, a reviewing court may be unable to determine the propriety or effect of the exclusion [of evidence] unless the substance of the proffered evidence is disclosed in the record. In that event, counsel should make an offer of proof, in the absence of the jury, stating the purpose of the offer and disclosing the content and purport of the expected testimony. . . . In the absence of an appropriate offer of proof, this court cannot speculate as to what line of questioning defense counsel intended to follow. A claim on appeal cannot be based on an assumption that the trial court acted improperly. . . . Without an adequate record on which to review the rulings of the trial court, this court must assume that the trial court acted properly." (Citations omitted; internal quotation marks omitted.) *State* v. *Cavell*, 34 Conn. App. 276, 289 n.7, 641 A.2d 426 (1994), aff'd, 235 Conn. 711, 670 A.2d 261 (1996); see also *State* v. *Rodriguez*, 146 Conn. App. 99, 104–108, 110, 75 A.3d 798 (failure to make offer of proof results in inadequate record for review of claim that trial court improperly denied motion to present newly discovered evidence), cert. denied, 310 Conn. 948, 80 A.3d 906 (2013); *In re Alison M.*, 127 Conn. App. 197, 222–24, 15 A.3d 194 (2011) (failure to make offer of proof results in inadequate record for review of claim that court improperly precluded respondent from presenting expert opinion testimony).

The present claim, despite involving, *in part*, a restriction on the defendant's ability to present evidence, cannot be characterized as being evidentiary in nature. The court, in conditioning its *Crawford* ruling in the manner that it did, made an integral component of the state's case off limits to the defense. Moreover, the court did not merely prohibit the introduction of evidence, but precluded the defendant from challenging, *in any manner*, the state's evidence concerning Taylor's injuries. The ruling broadly restricted the defendant's right to cross-examine Olson (and other witnesses) and to challenge during argument before the jury the state's evidence related to Taylor's injuries.

The admissibility of evidence of Taylor's out-of-court statements was hotly contested at trial. The defendant's attorney objected to Olson's testimony concerning "a bite mark" on Taylor, yet in his cross-examination of Taylor, which followed the court's ruling, he did not challenge the basis of his opinion in this regard. Although, during argument, the prosecutor relied on its evidence that Taylor had been bitten, the defendant's attorney referred in a brief, general manner—perhaps coming close to violating the court's ruling—that there was "no forensic evidence to explain the marks on [Taylor's] hands . . . ." In the context of this claim, the state does not argue that the court's ruling was harmless beyond a reasonable doubt and, from our review of the nature of the defendant's arguments advanced at trial, we conclude that the court's ruling harmed the defense in its ability to counter the state's proof and its theory of the case. Accordingly, we conclude, under these circumstances, that the defendant's failure to make an offer of proof is not fatal to his claim.

[14] Earlier in the trial, the state presented evidence that the operator of the bus, Connecticut Transit, had given police still images of the unknown suspect depicted in the surveillance videos from the bus. Later, the state presented evidence that the police disseminated one of these images to

the public.

[15] Although our resolution of the present claim, as well as the claim addressed in part II of this opinion, renders it unnecessary for us to consider whether the court's ruling was harmful to the defendant, we readily observe that the jury was able to view the surveillance video from the bus, still photographs taken from that video, a photograph of the defendant, and the defendant himself, who appeared before the jury throughout the trial. Thus, apart from Clark's testimony, the jury had ample evidence before it from which to determine whether the defendant was one of the persons depicted on the video generated by the surveillance cameras on the bus.

[16] Also, for the reasons we have discussed in part II of this opinion, the defendant argues that the admission of Olson's testimony violated his right to confrontation under *Crawford* v. *Washington*, supra, 541 U.S. 68. See footnote 9 of this opinion. In this regard, the defendant argues that Olson's characterization of the injuries was not based on his personal knowledge or personal observations, but on his knowledge of Taylor's statements to the police concerning the crimes. In the context of this claim, the defendant refers to a portion of Olson's testimony that the court excluded from the evidence, specifically, Olson's testimony that Taylor told him that he had been bitten by the victim. The defendant is unable to demonstrate that a *Crawford* violation occurred with regard to testimony that the court excluded from the evidence, and, in part IV of this opinion, we will address the defendant's claim that the court improperly denied his motion for a mistrial, which was based on Olson's stricken testimony. In the present claim, however, we consider whether it was proper for Olson, without referring to Taylor's statement which the trial court excluded under *Crawford*, to opine that he had observed bite marks on Taylor.

[17] Although it is not dispositive to our analysis, we also recognize that Olson subsequently testified that, after talking to Taylor, he learned that the injury to his wrist was "[a] bite" inflicted by the victim. This testimony was stricken from the jury's consideration, but it nonetheless helps to inform our understanding of Olson's testimony.

[18] Perhaps in consideration of the defendant's objection, the court instructed the jury during Parker's testimony as follows: "[L]adies and gentlemen of the jury, this statement isn't being—what she heard, the statement that was made, isn't being allowed for the truth, it's being allowed for—it's not a statement against penal interest. . . . It's just not hearsay. It's not being introduced for the truth; it's being introduced just as a comment; that statements were made on the bus."

[19] The defendant does not claim that the court failed sua sponte to strike from the evidence any portion of Minott's testimony.

[20] To the extent that the defendant claims on hearsay grounds that the court improperly permitted the state to ask Minott, "[W]ere you able to provide anything to that individual?" to which Minott, replied, "No, sir," we readily reject the defendant's claim. The inquiry did not elicit evidence of an out-of-court statement.

[21] The state's reliance on *State* v. *Rivera*, 56 Conn. App. 182, 186–87, 742 A.2d 387 (1999), cert. denied, 252 Conn. 927, 746 A.2d 791 (2000), and *State* v. *DeMasi*, 34 Conn. App. 46, 57, 640 A.2d 138, cert. denied, 230 Conn. 906, 644 A.2d 920 (1994), is misplaced. In both of those cases, this court deemed claims of error related to objections to be unpreserved after determining that, in each case, the trial court had failed to rule on the objections at issue therein.

[22] Before the state called Smola to testify, the court instructed the jury as follows: "Ladies and gentlemen of the jury, during this testimony there's going to be the introduction of a video. . . . What is in the video is for you to determine. You obviously are the ultimate arbiters of what the facts are in this case, and the testimony is offered as assistance, but it's for you to determine. You can reject all, part, or none of the testimony if you wish, but you determine what it is that you see in that."

[23] The state argues that Smola's testimony concerning what was depicted in the video was admissible under *State* v. *Watson*, supra, 50 Conn. App. 600–601, and *State* v. *Gagnon*, 18 Conn. App. 694, 713–14, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989). Both cases are distinguishable from the present case and, thus, do not support the state's argument.

Smola was not an eyewitness to any criminal activity. At issue in *Watson* was the admissibility of *eyewitness* identifications of the defendant's automobile. *State* v. *Watson*, supra, 50 Conn. App. 600 ("[i]t is clear that the testimony regarding the identifications of the Yugo by . . . Pease, Spaulding, Stocking and Verderame was based on their own personal observations").

At issue in *Gagnon* was whether a police officer could opine with regard to the issue of whether a composite sketch resembled the defendant. *State v. Gagnon*, supra, 18 Conn. App. 713–14. That issue is distinguishable from the issue before us because it pertains to an issue for which the law permits a lay witness to render an opinion, specifically, the identity of persons. Moreover, in determining that the court properly had admitted such testimony in *Gagnon*, this court emphasized the witness' familiarity with the defendant: "Lay opinion may properly be admitted on the issue of the identity or similarity of persons. . . . Such testimony must, however, be based entirely on the witness' own perception or within his actual knowledge. . . . Because of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused will not constitute reversible error. . . . The record is clear that [the witness] knew the defendant and had professional encounters with him in the past so as to satisfy the above standard." (Citations omitted; internal quotation marks omitted.) Id., 714.

[24] We will address the defendant's claim that the court improperly permitted Smola to testify with regard to what he learned from Taylor in this regard in part III F of this opinion.

———————————————